**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

STANLEY EUGENE HILL,

      Defendant - Appellant.

No. 12-5154

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:11-CR-00179-GKF-2)**

---

Howard A. Pincus, Assistant Federal Public Defender (Warren R. Williamson, Federal Public Defender, Interim, with him on the briefs), Office of the Federal Public Defender, Denver, Colorado, for the Defendant-Appellant.

Joel-lyn Alicia McCormick, Assistant United States Attorney (Danny C. Williams, Sr., United States Attorney and Leena Alam, Assistant United States Attorney, with her on the briefs), Office of the United States Attorney, Tulsa, Oklahoma, for the Plaintiff-Appellee.

---

Before **LUCERO**, **MURPHY**, and **MATHESON**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

Stanley Hill appeals following his conviction on several charges related to the robbery of a bank. During trial, Charles Jones, a special agent with the Federal Bureau of Investigation ("FBI"), testified as an expert. Agent Jones stated that he was trained in "special tactics and ways to identify [] deception in statements and truths in statements" and that in his opinion, many of Stanley's[1] answers were not worthy of credence and "[did] not make sense." Jones claimed that Stanley displayed evasive behaviors "common among the criminal element to keep law enforcement at bay" during an interrogation. When asked about Stanley's statement that he would rather die than face charges, Jones testified, "Never in my career have I seen that with an innocent person." And when the prosecutor asked about Stanley's repeated invocations of God in support of his truthfulness, Jones stated, "My training has shown me, and more[ ]so my experience in all these interviews, when people start bringing faith into validating [] their statements, that they're deceptive. Those are deceptive statements."

Stanley did not contemporaneously object to the admission of this evidence. Nevertheless, we conclude the court plainly erred in admitting this testimony and, in light of the relative weakness of the government's overall case, that it affected Stanley's substantial rights. We further conclude that this is one of the exceptional cases in which we exercise our discretion to notice the plain error because failing to do so would seriously undermine the fairness, integrity, or public reputation of judicial proceedings.

---

[1] Because this case involves several individuals with the surname Hill, we will refer to these individuals by their first names.

Exercising jurisdiction under 28 U.S.C. § 1291, we reverse.

## I

Stanley Hill and his brother, Vernon Hill, were charged with bank robbery with a dangerous weapon and use of a firearm during and in relation to a crime of violence following the November 5, 2011, robbery of an Arvest Bank in Tulsa, Oklahoma. Stanley was also charged with being a felon in possession of a firearm. Following a jury trial, Vernon was convicted of both charges against him. The jury deadlocked on the charges against Stanley, and the district court declared a mistrial.

The government proceeded at the first trial upon the theory that Vernon and Stanley were the two men who physically entered and robbed the bank. After discovering additional evidence, however, the government came to believe that Vernon and another Hill brother, Dejuan, were the two individuals who entered the bank while Stanley acted as a getaway driver. Stanley and Dejuan were charged by superseding indictment with a Hobbs Act violation, bank robbery with a dangerous weapon, and use of a firearm during and in relation to a crime of violence. Stanley was also charged a second time with being a felon in possession of a firearm.

## A

At the second trial, the government adduced testimony from several individuals who witnessed the robbery. A customer of the bank testified that she observed two men wearing hoodies and gloves standing near the bank just before the robbery, one of whom was talking on a cell phone. Bank employees testified that two masked men entered the

-3-

bank shortly after it opened, ordered the occupants to the floor, and demanded money. One of the robbers brandished a firearm, identified by one of the employees as a 9mm. The thieves put money into a tan-colored pillow case and fled west on foot. A witness who lived near the bank testified that he saw two men running down the street carrying a white bag shortly after the robbery.

The stolen cash included "bait bills" containing a GPS tracking device. This device automatically activated upon being removed from a teller's drawer and sent a notification to a Tulsa police sergeant at 8:30 or 8:31 a.m. The speed of the tracking device indicated it was being transported in a vehicle. Within a few minutes, it came to a stop in the vicinity of 1100 East Pine in Tulsa. A Tulsa police officer testified that within five to ten minutes of being notified by dispatch of the bank robbery, he arrived in that area and focused on a residence at 1107 East Pine (the "East Pine residence"). Shortly after he arrived on the scene, the officer reported that a black Nissan Altima left the driveway of that home. The driver was later identified as Dejuan. No other person entered or exited the home during the officer's surveillance. The tracking device indicated that it was located within the East Pine residence.

After approximately two hours, officers observed Stanley exiting the home and took him into custody. A short time later, Vernon came outside and was also detained. The brothers were transported separately to a Tulsa police station. Stanley identified himself as Daniel Hill and provided a birth date and social security number. After pulling up a picture of Daniel Hill and noticing the absence of a tattoo on Stanley's arm, a

-4-

detective confronted Stanley about his identity. Stanley began crying and asked to speak with the detective in a room out of Vernon's earshot. After being moved to a separate interview room, Stanley identified himself truthfully.

Tulsa Police Corporal Christopher Stout and Agent Jones conducted a videotaped interview with Stanley, which was played for the jury. In his interview, Stanley stated that he woke up at his girlfriend Whitney Landrum's home although he claimed not to know her address. He said that after waking up he went to the home at 1107 East Pine, which Stanley identified as belonging to his father, Stanley Battle. He claimed that no one was present when he arrived at roughly 6:00 a.m., and that he watched television and fell asleep in the living room shortly thereafter. Stanley said that he planned to watch his stepsister, who was going to be dropped off at the home by her mother sometime that morning. He was unsure of the step-sister's exact age, stating that she was about 11, and said he did not know the name of her mother. Stanley did not know the exact time she was going to be dropped off.

Stanley claimed he was awoken by the house phone several hours later and was informed there were police outside. He went outside and was taken into custody. Stanley claimed that an officer told him that another man had left the house, and said that he did not hear anyone come or go while he was sleeping. He stated in the interview that he was not sleeping very deeply, and would have known if anyone else was in the home.

After hearing Stanley's story, the interviewers challenged his version of the facts. They explained that a bank has been robbed and that material from the bank was found in

the East Pine residence. They suggested that if he was the only one in the house, he was likely the bank robber. Stanley then acknowledged that his brother exited the home after he did, but said he did not know anyone else was in the home. He denied involvement in the bank robbery. When officers expressed disbelief, he repeatedly stated that he would swear on the Bible, and swore to God that he was telling the truth. He also stated that he did not want to live and that he would rather die than face charges.

Meanwhile, Tulsa Police obtained a search warrant for the East Pine residence. Officers discovered a tan-colored pillowcase full of cash in the bottom drawer of the oven, including the tracking device taken from the Arvest Bank. An officer testified that "the drawer was very full of pots and pans" and that he could hear officers "struggling to get that drawer open with pots and pans in the way" from the living room. The living room was located fifteen to eighteen feet from the kitchen. Officers also found a Glock .45 caliber pistol, a pair of black pants, a black ski mask, and two pairs of black gloves in a bedroom of the house. They discovered mail addressed to Vernon and Battle.

Corporal Stout testified about the difficulties he encountered attempting to contact Landrum. He stated that Landrum repeatedly hung up on him, and that Landrum resisted contact when served with a subpoena. He also learned that Landrum drove a black 2004 Nissan Maxima. Landrum was subpoenaed, asserted her Fifth Amendment rights, and was granted immunity. She testified that Stanley is her boyfriend and the father of two of her children. Landrum further testified that Stanley left her home early in the morning on the day of the robbery and that she went to the East Pine residence sometime around 8:00

-6-

or 9:00 a.m. to pick him up. By the time she arrived in her Nissan, police were already on the scene.

The prosecution also introduced two phone calls made by Stanley from jail. In a discussion between Stanley and Landrum about bond money, Landrum relays that Vernon referred to Stanley as "the weak link of the group" and that he suggested Stanley be bailed out first if possible. In another call between Stanley and his father, Battle warns Stanley not to say "nothing to do with what they holding y'all for . . . don't say where you was." Battle notes that the police might suggest other people had provided information, and says, "you know we're family, we stick together, so you don't have to worry about the police talking about who told what."

**B**

A significant portion of the government's case involved cell phone evidence. Neither Vernon nor Stanley was carrying a cell phone when they were taken to the police station. Landrum testified that her cell phone number ended in "3860" and that she was not sure where her phone was at the time of the robbery. She also stated that she spoke with Vernon and Dejuan by phone regularly. A phone company employee testified that Vernon subscribed to a cell phone number ending in "9204," and that Landrum subscribed to two different numbers: the number ending in 3860, and another phone number ending in "1576." Landrum told investigators that she did not know which phone Stanley was using on the day of the robbery, but she was certain it was not Vernon's phone. Stanley provided the 1576 number as a contact number to officers on

the day of the robbery. Dejuan also listed the 1576 number as his contact information when visiting his brothers in jail.

Another special agent with the FBI testified about cell phone tower data. He explained that cell phone towers typically include three separate receivers, each of which provides cellular service to a wedge-shaped "sector" emanating from the tower. Each sector encompasses 120 degrees, meaning that a tower provides 360 degrees of coverage. Phone companies maintain data on the tower and sector to which a cell phone connects when making or receiving a call. The agent testified that in densely populated areas, cell phone towers are designed to have some overlap such that a phone might connect to two different towers from the same location, but that the data provides a "general area" from which a call was placed or received. The agent prepared several exhibits showing the locations of various towers in the Tulsa region, superimposed with highlighted areas depicting an approximate range for each relevant tower sector. He stated that the angles of the sectors depicted in the maps were "definitive" but that the distance from the tower was a "general depiction" based on his training and experience. The maps show that Arvest Bank is located to the southeast of the East Pine residence, and that Landrum's home is between the two, not far from the bank.

The cell tower data showed that Vernon's phone, ending in 9204, contacted the

tower nearest Arvest Bank on the evening prior to the robbery.[2] It was located in the sector that includes Landrum's home at 6:47 a.m. on November 5, the day of the robbery. The phone then received a call while located near the East Pine residence at 7:09 a.m. At 8:19 and 8:30, the phone contacted two towers near Arvest Bank. Seconds before 8:31, and just before the robbery, Vernon's phone made a call that contacted the tower nearest Arvest Bank. At 8:53 and 9:07, Vernon's phone was again located in the vicinity of the East Pine residence.

The phone number ending in 3860 also provided detailed information. That phone received a call from Vernon's phone at 6:47 a.m. and it too was located near Landrum's home. At 7:15, it received a call from the 1576 phone and was still located in the vicinity of Landrum's home. At 8:19, Vernon's phone called the 3860 number, and both phones contacted the same tower near the Arvest Bank. The two calls made from Vernon's phone at 8:30 were both to the 3860 number, and the two phones contacted the same towers: the first call connected the phones through a tower near Arvest Bank, and the second call went through the tower nearest the bank. At 9:04, the 3860 phone connected to a tower located southwest of the East Pine residence. The 3860 phone exchanged several calls with Vernon's phone from several different towers, apparently while travelling in a southerly direction.

The data on the phone ending in 1576 was more limited. It contacted a tower near

---

[2] The government's evidence indicated that the area just west of Arvest Bank was served by up to three separate towers.

Arvest Bank the night before the robbery. Between 7:09 and 7:14 a.m. the morning of the robbery, that phone exchanged several calls with Vernon's phone while both were located near the East Pine residence. At 7:15 and 7:16, the 1576 number was near the East Pine residence when it exchanged calls with the 3860 number, which as noted above, was in the vicinity of the Landrum home. At 8:07, the 1576 number called an unknown phone number from the vicinity of the Landrum home, and was turned off shortly thereafter.

Special Agent Jones provided testimony as the case agent on the government's theory of the case. Jones testified that he "believe[d] Stanley Hill was the getaway driver waiting for Dejuan and Vernon to exit the bank and get in the vehicle as he drove them to 1107 E. Pine after the bank robbery." With respect to the cell phone data, Jones opined that Dejuan was carrying the 1576 phone and Vernon the 9204 phone on the night before the robbery, and were "casing" the bank when those phones contacted the tower nearest the bank on the evening of November 4. On the morning of the robbery, Jones believed that Stanley had the 3860 phone, and was using it to communicate with Vernon and Dejuan through Vernon's phone. Jones stated that he believed Dejuan was carrying the 1576 phone on November 5, but had it switched off during the time of the robbery. According to Jones, Dejuan obtained the 3860 phone shortly after the robbery, which explained the southward movement of that phone during the time that Stanley and Vernon were known to be inside the East Pine residence.

## C

Jones also testified about the interrogation of Stanley. He stated that he had attended "two specialized courses in interrogation and interviews, including the Reid school, which is a higher-level school of interrogation and interviewing." He explained:

> [T]he Reid school is designed to – as an interview process and interrogation process; part of that is psychological as well. It's much like your five-year-old children and how you can break down a story or you understand what's going on during the process of that interview.
>
> In the Reid school, you're trained on some special tactics and ways to identify on deception in statements and truths in statements. That school is a sought-after school for investigators and interviewers because of the caliber of that training you do get towards that endeavor.

Jones further stated that he had conducted over a thousand interviews as an FBI agent.

The prosecution asked, "in reference to [his] earlier testimony regarding [his] training and experience in interrogating and interviewing," what Jones "based on [his] training and experience" took from the interrogation "as to [Stanley's] truthfulness." Jones responded:

> [T]he most difficult thing to tell the difference in is partial truths, . . . something that's partly true, that's a lot harder to detect than a flat-out lie or a convicting [sic] truth.
>
> So during the course of that interview, we were able to, as trained eyes, pick out that this isn't – these are partial truths, at best. And several of those are – they're shown through things that are not purposely said or done by the interviewee. They are responses that occur naturally, that's a psychological thing that happens, that we don't control.
>
> For example, in this case, and I've seen it in other interviews, a mumbling of something that they don't want to talk about. You may say, I was at the grocery store at three or whatever or whatever, and you will go away from the question and just discount that as something you don't need to know, Mr. Police Officer. And there was much of that going on throughout the interview, for whatever, or whatever, and whatever with Mr.

Stanley Hill's interview, occurred on a continuous basis, just avoiding – it's
a way to avoid the question without just flat out saying, I'm not going to
talk to you.

The prosecutor then asked, "In reference to the substance of the responses that

were provided . . . how does that factor into your observations of whether he's being

truthful or not?" She provided Stanley's claim that he planned to babysit his step-sister at

the East Pine home as an example of "the substance of responses." Jones answered that

Stanley's version of events "does not connect [the] dots," "does not make sense," and

was "not something that [he] viewed as reasonable." Specifically, Jones doubted that if

Stanley was going to be "responsible for a child," he would immediately fall asleep "and

never w[a]ke up while somehow bank robbery money got stuffed in the oven drawer of

your house, and then the bank robbers ran away before the police could get there, and you

didn't hear anything, but you were waiting on somebody to arrive in this unlocked house

in north Tulsa."

Jones then identified several factors that contributed to his opinion that Stanley

was being untruthful during the interview. He noted that after Stanley was told that

police found items connected to the bank robbery in the East Pine residence, Stanley's

story ha[d] to change a little bit. And prior to that, I wasn't sleeping that
hard. After that, "to my knowledge," "to my knowledge."
    I can't question his knowledge. I cannot say, I know what you
knew. But he could evade the question by saying, "well, to my
knowledge," because that's something I cannot corroborate. That is a move
that is common among the criminal element to keep law enforcement at bay
and not be able to determine the actual facts of what happened.

Jones also stated that Stanley's assertions that he "had no will to live" were

-12-

indicative of guilt, testifying: "I have not seen, in my experience, an innocent person willing to die because they were talking with police officers and FBI agents. Never in my career have I seen that with an innocent person." He continued: "I also don't reasonably believe an innocent person would want to die because they were being talked to by police officers. It doesn't make sense to me." The prosecutor asked if, "in [Jones'] experience, has it been a demonstration of consciousness of guilt that an individual will want to die rather than tell the truth." Jones responded, "In my experience, sometimes people believe death would be better than a long-term prison sentence."

The prosecution also asked how Jones viewed Stanley's "call on his faith or swearing to God" during the course of the interview. Jones testified:

> Beyond my own religious feelings towards what he was saying, the training that I've received, that is a common way that somebody with guilt will want to validate the story they're telling you. They can't validate it with facts, so they hope they can get you to believe them, because they're trying to validate their story through a supposed belief.
> He may be a God-fearing man, I do not know that, but the truth is the truth. You do not have to back the truth. When I'm asked a question, is the car blue, the car is blue. I don't have to swear to God. I do not have to bring religion into that statement. The truth is the truth.
> My training has shown me, and more[ ]so my experience in all these interviews, when people start bringing faith into validating of their statements, that they're deceptive. Those are deceptive statements.

Defense counsel did not make any objections during Jones' testimony about the truthfulness of Stanley's statements. Jones was the final witness at trial. During closing argument, the prosecutor referred the jury back to Jones' testimony, stating that Jones "in scrutinizing this interview with Stanley Hill . . . has to figure out what's truthful in this

interview, what's he trying to hide."

**D**

The jurors were instructed that they are "the judges of the facts" and that they are "the sole judges of the credibility or 'believability' of each witness." The instructions specifically discussed the witness "who expressed opinions concerning cell site tower analysis" and Jones, "who expressed opinions regarding investigation of conspiracies and robberies." This instruction stated that "scientific, technical, or other specialized knowledge may assist the jury in understanding the evidence or in determining a fact in issue." It also explained that "[a] witness who has such knowledge, skill, experience, training or education may testify and state an opinion concerning such matters." The jury was cautioned that it was "not required to accept such an opinion" and was instructed to give the opinion testimony "as much weight as you think it deserves, considering the education and experience of the witness, the soundness of the reasons given for the opinion, and other evidence." With respect to Stanley's out-of-court statement, the jury was instructed to consider various factors in "determining whether [this] statement is reliable and credible."

The jury deliberated for several hours. After submitting two questions to the judge, the jury returned a verdict of guilty on all counts. The district court sentenced Stanley to 154 months' imprisonment. He timely appealed.

**II**

Stanley advances a single argument on appeal: that the district court erred in

-14-

permitting Jones to provide expert opinion testimony as to Stanley's credibility. Because Stanley did not object below, we review only for plain error. See United States v. Frost, 684 F.3d 963, 971 (10th Cir. 2012). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (quotation omitted); see also Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.").

## A

"Error is 'plain' if it is obvious or clear, i.e., if it is contrary to well-settled law." United States v. Edgar, 348 F.3d 867, 871 (10th Cir. 2003) (quotation omitted). "In general, for an error to be contrary to well-settled law, either the Supreme Court or this court must have addressed the issue." United States v. DeChristopher, 695 F.3d 1082, 1091 (10th Cir. 2012) (quotation omitted). However, in certain circumstances, the "weight of authority from other circuits" may make an error plain even absent a holding from this court or the Supreme Court. United States v. Hardwell, 80 F.3d 1471, 1484 (10th Cir. 1996). We conclude that the admission of Jones' opinion testimony was error, and that it was plain.

As a general matter, expert opinion testimony may be introduced at trial if it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). An expert may provide opinion testimony if: "the testimony is based upon sufficient facts or data" and "is the product of reliable principles and methods," and "the

-15-

expert has reliably applied the principles and methods to the facts of the case." Fed. R.

Evid. 702(b)-(d). "The touchstone of admissibility under Rule 702 is the helpfulness of

the evidence to the trier of fact." United States v. Rangel-Arreola, 991 F.2d 1519, 1524

(10th Cir. 1993).

Stanley does not argue that Jones was unqualified to offer the opinion he provided,

but instead that the subject matter of his testimony—the credibility of another person—

may not be addressed by an expert testifying under Rule 702. We agree. As this court

made clear in United States v. Toledo, 985 F.2d 1462 (10th Cir. 1993), "[t]he credibility

of witnesses is generally not an appropriate subject for expert testimony." Id. at 1470.

There are several reasons for the prohibition against expert testimony on other witness'

credibility. Such testimony: (1) "usurps a critical function of the jury"; (2) "is not

helpful to the jury, which can make its own determination of credibility"; and (3) when

provided by "impressively qualified experts on the credibility of other witnesses is

prejudicial and unduly influences the jury." Id. (citations omitted).

In Toledo, we considered testimony from two psychiatrists who had examined the

victim of a kidnapping and sexual assault. One stated that "[n]o matter how crazy people

are or how psychotic people are, we, as therapists, try to look for that window of

normalcy; and there were certain little windows of normalcy that things she told me, I

knew were very true." Id. at 1469 (emphasis omitted). Another testified, "In my opinion,

it appears that what occurred was: One, she was off her medication; [and] two, she

underwent emotional trauma that contributed to her psychotic symptoms." Id. (emphasis

omitted). The same witness, when asked to distinguish between "what's delusional from what is accurate history as reported by the patient," responded that "delusions are fixed false beliefs which have no basis in reality and histories are – well, if it makes sense, then its [sic] not a delusion." Id. He then concluded that portions of the victim's story "were consistent with a high likelihood that [an abduction] occurred." Id. (emphasis omitted).

In considering the admissibility of this testimony, we discussed at length an Eighth Circuit case, United States v. Azure, 801 F.2d 336 (8th Cir. 1986), in which the court reversed a conviction after a pediatrician testified that the victim "was believable and that he could 'see no reason why she would not be telling the truth. . . .'" Id. at 339. The district court concluded that this statement "was admissible under Fed. R. Evid. 702 as an expert opinion"; the Eighth Circuit disagreed. Id. at 339, 340-41. The Toledo panel focused on the Eighth Circuit's statement that an expert might permissibly testify "about a child's ability to separate truth from fantasy, [or] by summarizing the medical evidence and expressing his opinion as to whether it was consistent with [the victim's] story that she was sexually abused." 985 F.2d at 1470 (quoting Azure, 801 F.2d at 340). We also noted another Eighth Circuit decision that upheld a conviction in a case involving a child psychologist's testimony "that it was not unusual for a child victim of sexual abuse to link two traumatic events together, even though they did not actually occur at the same time" and that "'whether or not they were contingent in time they both occurred.'" Id. (quoting United States v. Provost, 875 F.2d 172, 176 (8th Cir. 1989) (emphasis omitted)). In light of these two cases, we held that "the admissibility of the testimony in question

-17-

here presents a close question" and thus denied relief under the plain error standard.  Id.

In United States v. Charley, 189 F.3d 1251 (10th Cir. 1999), we held that a district court did not err in admitting a pediatrician's testimony that sexual abuse would provide a unifying diagnosis for several of the victim's physical and emotional problems, id. at 1263-64,  but reached the opposite conclusion as to another expert's statement of "her unconditional opinion that each of the girls was in fact sexually abused."  Id. at 1266.  To the extent the opinion was "based on crediting the girls' account, whether disclosed to her or others," it amounted to an expert "essentially vouching for their truthfulness."  Id. at 1267.  We ruled that "expert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not 'assist the trier of fact' as required by Rule 702."  Id.  However, we determined that the admission of the expert's opinion was harmless "[i]n light of the strength of the properly admitted testimony."  Id. at 1272.

In United States v. Velarde, 214 F.3d 1204 (10th Cir. 2000), the same expert at issue in Charley testified that if certain behavioral symptoms were present, she would be "comfortable forming a diagnosis of child sexual abuse" and that she "would base that diagnosis on the child's statements about what had happened to them."  214 F.3d at 1209. We declined to reach the issue of whether this testimony would have been admissible, id. at 1211, but noted the expert's assertion "that she would base her diagnosis of child sexual abuse on the child's statements about what had happened to them, appears to be impermissible vouching for [the victim's] credibility," id. at 1211 n.6 (quotation

-18-

omitted). We reached the same conclusion as to a second expert's testimony that she found no evidence suggesting the victim "was subject to either lying or overexaggerated fantasizing in her life." Id. at 1211. The Velarde panel rejected a harmless error argument and remanded for a new trial. Id. at 1212.

In United States v. Samara, 643 F.2d 701 (10th Cir. 1981), which we cited in Toledo, 985 F.2d at 1470, we rejected a claim that an expert should have been permitted to state an opinion that other witnesses were not credible. The government supported its charges of income tax violations in that case with testimony from numerous witnesses who paid legal fees to the defendant. Samara, 643 F.2d at 702. The government summarized this evidence in an exhibit that showed a substantial amount of unreported gross income. Id. The defendant sought to challenge that summary with his own expert who prepared a competing exhibit "purporting to show that certain items should be deleted from the government's showing of gross receipts." Id. at 705. This expert based the deletions on "witness credibility because of felony convictions and lack of documentation." Id. We affirmed the district court's exclusion of the exhibit and related testimony "on the ground that credibility was for determination by the jury, not by a defense witness" because "[a]n expert may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility." Id. (quotation omitted).

We have repeatedly affirmed the exclusion of expert evidence suggesting that a defendant was likely to make a false confession. See United States v. Benally, 541 F.3d

-19-

990, 995 (10th Cir. 2008); United States v. Adams, 271 F.3d 1236, 1246 (10th Cir. 2001). And we denied habeas relief, under a de novo standard of review, on a claim that a state court erred in excluding expert testimony stating certain child witnesses were not credible. Gilson v. Sirmons, 520 F.3d 1196, 1243 (10th Cir. 2008). Each of these rulings was based on the theory that the credibility of another is not an appropriate subject for expert opinion testimony.

It appears our sibling circuits that have considered this issue have uniformly agreed. See Engesser v. Dooley, 457 F.3d 731, 736 (8th Cir. 2006) ("An expert may not opine on another witness's credibility."); Nimely v. City of New York, 414 F.3d 381, 398 (2d Cir. 2005) ("[T]his court, echoed by our sister circuits, has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702."); United States v. Vest, 116 F.3d 1179, 1185 (7th Cir. 1997) ("Credibility is not a proper subject for expert testimony; the jury does not need an expert to tell it whom to believe, and the expert's stamp of approval on a particular witness' testimony may unduly influence the jury." (quotations omitted)); United States v. Gonzalez-Maldonado, 115 F.3d 9, 16 (1st Cir. 1997) ("An expert's opinion that another witness is lying or telling the truth is ordinarily inadmissible pursuant to Rule 702 because the opinion exceeds the scope of the expert's specialized knowledge and therefore merely informs the jury that it should reach a particular conclusion." (quotation omitted)); United States v. Beasley, 72 F.3d 1518, 1528 (11th Cir. 1996) ("Absent unusual circumstances, expert

medical testimony concerning the truthfulness or credibility of a witness is inadmissible . . . because it invades the jury's province to make credibility determinations."); <u>United States v. Rivera</u>, 43 F.3d 1291, 1295 (9th Cir. 1995) ("[A]n expert witness is not permitted to testify specifically to a witness' credibility or to testify in such a manner as to improperly buttress a witness' credibility." (quotation and alteration omitted)); <u>United States v. Dorsey</u>, 45 F.3d 809, 815 (4th Cir. 1995) ("[E]xpert testimony can be properly excluded if it is introduced merely to cast doubt on the credibility of other eyewitnesses, since the evaluation of a witness's credibility is a determination usually within the jury's exclusive purview.").

Although the government acknowledges this court's jurisprudence on this point, it contends that the case at bar is distinguishable in two crucial respects. First, the government argues that the foregoing Tenth Circuit cases establish a rule that it is impermissible for an expert to vouch <u>for</u> the credibility of a witness, but say nothing about an expert's opinion that a defendant is <u>not</u> credible. We disagree. Our opinion in <u>Toledo</u> does not distinguish between pro- and anti-credibility opinions, stating instead that "[t]he credibility of witnesses is generally not an appropriate subject for expert testimony." 985 F.2d at 1469. Moreover, the reasons noted for this rule are that such testimony "usurps a critical function of the jury," "is not helpful to the jury, which can make its own determination of credibility," and "the testimony of impressively qualified experts on the credibility of other witnesses is prejudicial and unduly influences the jury." <u>Id.</u> at 1469-70. These rationales apply with equal force in the context of opinion

testimony that attacks credibility. Further, the government's theory does not account for our holdings affirming the exclusion of expert testimony indicating that other witnesses or other out-of-court statements were not credible. See Benally, 541 F.3d at 995; Adams, 271 F.3d at 1246; Samara, 643 F.2d at 705.[3]

The government also seeks to distinguish our circuit precedent as a factual matter, arguing that Stanley was not a witness at the trial and therefore the case at bar is not analogous to the above-cited cases. It is true that Stanley did not testify; his recorded out-of-court statements were played for the jury. But the Federal Rules of Evidence provide that statements by in-court witnesses and out-of-court declarants should be treated the same with respect to credibility: "the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness." Fed. R. Evid. 806. And our court has previously applied the rule that expert opinion testimony is not a permissible form of evidence as to a declarant's credibility. In Bledsoe v. Bruce, 569 F.3d 1223 (10th Cir. 2009), we considered whether counsel had been ineffective in failing to object to a detective's testimony that he believed an out-of-court statement. Id. at 1237. After quoting Toledo, and noting that the state court had determined counsel's failure to object constituted deficient performance because "this was objectionable testimony that invaded the

---

[3] In each of these cases, we reviewed the district court's ruling for an abuse of discretion. A deferential standard of review is nonetheless sufficient to develop the "well-settled law," Edgar, 348 F.3d at 871 (quotation omitted), required to satisfy the second prong of plain-error review.

province of the jury," we held that the state court's conclusion that the error did not cause prejudice was at least reasonable. Id. at 1237-38 (quotation omitted).

The government also contends that because Stanley's recorded statement was played for the jury, and because Jones identified specific aspects of Stanley's statements that were indicative of untruthfulness, his testimony assisted the jury rather than usurping its role. The government cites United States v. Simpson, 7 F.3d 186 (10th Cir. 1993), in which we stated that "[w]hen an expert merely states an opinion on an ultimate issue without adequately exploring the criteria upon which the opinion is based, the jury is provided with no independent means by which it can reach its own conclusion or give proper weight to the expert testimony." Id. at 188-89. We held that the district court did not abuse its discretion in excluding testimony from a banking expert that certain transactions amounted to "concealment of funds," id. at 188, but noted it was a "close question," id. at 189. The government also relies on United States v. Zepeda-Lopez, 478 F.3d 1213 (10th Cir. 2007), in which we permitted an officer's opinion that the voice on a tape belonged to the defendant because the officer had reviewed the tape many times and thus the "testimony was helpful to [the jury] in deciding whether Mr. Zepeda-Lopez appeared on the portion of the video tape played" at trial. Id. at 1222. However, neither of these cases involved an expert offering his opinion of the veracity of another's statements, which we have repeatedly held is "not an appropriate subject for expert testimony." Toledo, 985 F.2d at 1470. It was the subject, rather than the particular manner, of Jones expert opinion testimony that was improper.

We must also reject the government's characterization of Jones' testimony as merely providing to the jury expert tools to permit them to make their own credibility determinations. First, much of the testimony asserted fairly obvious and commonly understood issues of veracity. For example, Jones identified as indicators of mendacity Stanley's attempt to steer the conversation away from questions he did not want to answer and the changing of his story during the course of the interview. The reason the issue of credibility "belongs to the jury" is that jurors "are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men." Aetna Life Ins. Co. v. Ward, 140 U.S. 76, 88 (1891). A jury does not need an expert to inform it that a witness who changes his story may be less than truthful.

We acknowledge that in some narrowly circumscribed situations, expert testimony that touches on the issue of credibility might be properly admitted. For example, in United States v. Shay, 57 F.3d 126 (1st Cir. 1995), the court held that a psychiatrist should have been permitted to testify that the defendant "suffered from a recognized mental disorder known as 'pseudologia fantastica'" that caused him to tell false and self-aggrandizing stories. Id. at 129, 133-34. And in United States v. Hall, 93 F.3d 1337 (7th Cir. 1996), the court ordered a new trial following the exclusion of expert testimony suggesting that false confessions sometimes occur and that the defendant had a "personality disorder that makes him susceptible to suggestion." Id. at 1341. The court held that "[i]t was precisely because juries are unlikely to know that social scientists and psychologists have identified a personality disorder that will cause individuals to make

-24-

false confessions that the testimony would have assisted the jury in making its decision." Id. at 1345. Similarly, our decision in Toledo dealt with psychiatric testimony regarding the nature of delusions, 985 F.2d at 1469, and analogized to child psychiatry issues outside the ken of a normal juror, id. at 1470.

As we explained in Adams, however, there is a wide gulf between that type of specialized psychiatric knowledge, which one would not expect a jury to possess, and testimony that merely asserts an opinion as to the veracity of an "explanation that a jury is capable of resolving without expert testimony." 271 F.3d at 1246 (citing Hall, 93 F.3d at 1341 and Shay, 57 F.3d at 129-30). Jones' testimony plainly fell into the latter category, and thus impermissibly "'encroache[d] upon the jury's vital and exclusive function to make credibility determinations.'" Id. (quoting Charley, 189 F.3d at 1267). After being asked what he drew from the interview "as to [Stanley's] truthfulness," Jones stated that Stanley provided "partial truths" and continually sought to "avoid the question[s]" asked of him. The prosecutor followed with a clearly inappropriate question, inquiring, "In reference to the substance of responses that were provided . . . how does that factor into your observation of whether he's being truthful or not?" Jones then summarized the story Stanley provided and stated: "It does not connect the dots. That does not make sense. That is not something that I viewed as reasonable."

This testimony plainly violated Rule 702 and our case law interpreting the rule. Even if Agent Jones arguably had "specialized knowledge," Fed. R. Evid. 702(a), on the subject of interrogations, his testimony on Stanley's credibility fails under Rule 702

-25-

because it "encroache[d] upon the jury's vital and exclusive function to make credibility determinations, and therefore [did] not assist the trier of fact." Charley, 189 F.3d at 1267 (quotation omitted). He simply informed the jury that Stanley's version of events was unworthy of belief based on his opinion of what is generally "reasonable." We cannot excuse his statement as a witness veering into non-responsive commentary; the prosecutor specifically asked about the effect the "substance" of Stanley's responses had on Jones' "observation of whether [Stanley was] being truthful or not."

Moreover, this exchange was not an isolated aside. Jones' testimony as to Stanley's credibility continued with Jones claiming that Stanley's references to his subjective knowledge "is a move that is common among the criminal element to keep law enforcement at bay and not be able to determine the actual facts of what happened." The prosecutor mischaracterized Stanley's statements in the video by asking whether it was "a demonstration of consciousness of guilt that an individual will want to die rather than tell the truth."[4] On the same topic of Stanley's claim that he would rather die than be imprisoned, Jones stated, "Never in my career have I seen that with an innocent person." He also asserted that "when people start bringing faith into validating of their statements,

_____

[4] A review of the video of the interview beginning at the 35 minute mark indicates that it was Corporal Stout, not Stanley, who referred to preferring death rather than telling the truth. Stout's follow up question to Stanley's statement that he would "rather die" was: "You'd rather die than tell us the truth?" Stanley's response was, "I am telling the truth." Both the context of the exchange and the actual video of the interview confirm that the questioning of Agent Jones at trial was premised on a misrepresentation of Stanley's statements.

that they're deceptive. Those are deceptive statements."

Contrary to the government's claim, Jones testified flatly and repeatedly that, in his expert opinion, Stanley was dishonest during his interview. Because our court has clearly held that "credibility [i]s for determination by the jury," and "[a]n expert may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility," Samara, 643 F.2d at 705 (quotation omitted), the admission of this testimony meets the stringent standard of plain error. See United States v. Toro-Pelaez, 107 F.3d 819, 827 (10th Cir. 1997) (holding that "only a particularly egregious and obvious and substantial error" qualifies as plain (quotation omitted)).

**B**

This conclusion does not end our inquiry. To obtain relief, Stanley must also show "that the plain error affected his substantial rights." United States v. Trujillo-Terrazas, 405 F.3d 814, 818 (10th Cir. 2005). That is, he must demonstrate "a reasonable probability that but for the error claimed, the result of the proceeding would have been different." Id. at 819 (quotation and alteration omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." United States v. Hasan, 526 F.3d 653, 665 (10th Cir. 2008) (quotation omitted). "The reasonable-probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different." United States v. Dominguez Benitez, 542 U.S. 74, 83 n.9 (2009) (quotation omitted).

-27-

The government's case against Stanley was far from airtight. Its best evidence was Stanley's presence, shortly after the crime occurred, in his father's home where he claimed to have been sleeping in the living room. Officers discovered money stolen from the bank in the home's kitchen, and clothing and a firearm consistent with those used in the robbery in a bedroom.[5] In many circumstances, such evidence standing alone might qualify as sufficiently probative of guilt to conclude that the defendant's substantial rights were unaffected by the improper admission of opinion testimony. In this case, however, the probative value of Stanley's presence at the East Pine residence is somewhat undercut by the fact that Stanley's two brothers were also present at the home just after the robbery. Vernon has already been convicted of charges relating to the robbery, and Dejuan was also charged. The government expressly proceeded upon the theory that those two brothers were the two individuals who entered the bank and that Stanley was the getaway driver. It would have been reasonable for the jury to conclude that Vernon and/or Dejuan robbed the bank and that Stanley simply had the bad luck to be present at his father's home when police surrounded it, especially given the absence of evidence presented about the identity of the getaway driver. At Stanley's first trial, the government proceeded on the theory that Stanley was present in the bank and the jury

---

[5] The firearm discovered at the East Pine residence formed the basis of the felon in possession charge. The jury was instructed that mere presence was insufficient to establish possession, and that the government was required to prove some connection between Stanley and the firearm. Absent any evidence tying Stanley to the gun (other than the evidence suggesting he was involved in the bank robbery), we conclude that the firearm conviction must stand or fall with the other convictions.

deadlocked on the charges against him.

The government draws our attention to the cell tower evidence, which was not introduced at the first trial. But the phone most closely tied to Stanley by the evidence, with a number ending in 1576, did not produce much in the way of incriminating information. That phone was registered to Landrum and was listed by both Stanley and Dejuan as a contact number. It was located near Arvest Bank the night before the robbery, but the tower servicing the bank covered a fairly large area of Tulsa and was very near Landrum's home. On the morning of the robbery, the 1576 phone was located first near the East Pine residence, then near Landrum's home, when it exchanged calls with the two other phones discussed at trial. At the time of the robbery, it was turned off.

The phone registered to Vernon, and the other phone registered to Landrum, with a number ending in 3860, told a more compelling story. Those phones contained data strongly suggesting that they were used by a bank robber and a nearby getaway driver, and this theory was supported by eyewitness testimony. Jones testified that he believed Dejuan was carrying the 1576 phone and that Stanley was carrying the 3860 phone, but the prosecution did not cite any evidence supporting the assertion that Stanley had the 3860 phone. Further, the 3860 phone was tracked moving away from the East Pine residence at the time Stanley and Vernon were holed up in that house. Jones professed his belief that Dejuan obtained that phone from Stanley just after the robbery, but there was no evidence advanced to support this supposition. The cell tower testimony was not significantly probative of Stanley's involvement.

The government also points to the recorded phone calls Stanley made from jail.  In one call, Landrum mentions a discussion in which Stanley was referred to as "the weak link of the group."  The government argues that this is evidence of conspiracy, but it may simply refer to Stanley's fortitude in dealing with incarceration.  In another call, Stanley's father warns him not to say "nothing to do with what they holding y'all for . . . don't say where you was."  Given that Stanley's brother was jailed on the same charges, this statement is hardly definitive proof of Stanley's involvement.  Stanley's father may simply be telling Stanley to exercise his Fifth Amendment rights in an effort to protect his children.

In addition to the foregoing evidence, the government relies on Stanley's lack of candor when apprehended.  He falsely identified himself when arrested.  When confronted, he became tearful and provided his true identity only after being moved away from his brother Vernon.  And it is clear that Stanley behaved evasively in his interview with Jones.  He claimed not to know Landrum's address.  And he stated that he was planning to watch his stepsister, but said he did not know the name of the girl's mother.  We must view Stanley's evasiveness during the interview in light of the fact that he knew his brother was also seized from the home.  The jury may well have concluded that Stanley was wary of saying anything if he knew or suspected that Vernon and/or Dejuan had committed a crime.  Indeed, Stanley's father later advised him to keep quiet, reminding Stanley, "you know we're family, we stick together."

The government also argues Stanley's claim that he was sleeping through the

relevant events is implausible. It points to an officer's testimony that the oven drawer in which the robbery proceeds were secreted was loaded with pots and pans, and that he could hear other officers struggling to open the drawer from the room in which Stanley claimed to be sleeping. Of course, an individual stashing robbery proceeds would likely attempt to keep quiet, whereas a group of officers executing a search warrant would have no need for stealth. And as noted above, a jury's finding that Stanley attempted to avoid disclosing his full knowledge during the interview does not mandate a conclusion that he conspired to rob Arvest Bank.[6]

In light of this evidence, we conclude that there is a reasonable probability that but for Jones' improper testimony, the result of Stanley's trial would have been different. Jones' testimony directly contradicted Stanley's "wrong place, wrong time" theory. He informed the jury that despite conducting more than a thousand interviews, he had "[n]ever in [his] career" seen "an innocent person" display the behaviors exhibited by Stanley. Jones opined: "I also don't reasonably believe an innocent person would" behave as Stanley did. And he described Stanley's reliance on subjective knowledge and appeals to religion as "common among the criminal element" and something done by "somebody with guilt." In closing arguments, the government asked the jury to rely on Jones' expertise: "Agent Jones, in scrutinizing this interview with Stanley Hill, he talks

---

[6] We note that the jury was not instructed that it could convict based on a conspiracy to act as an accessory after the fact. See United States v. Lang, 364 F.3d 1210, 1223-24 (10th Cir. 2004) (discussing this theory), vacated on other grounds, 543 U.S. 1108 (2005).

about how in his approach to interviewing and interrogation, sometimes he has to piece through, he has to figure out what's truthful in this interview, what's he trying to hide."

The government urges us to disregard the plainly erroneous admission of Jones' testimony because the jurors were instructed that they were "the judges of the facts" and "the sole judges of the credibility or 'believability' of each witness." Jurors are presumed to follow their instructions. United States v. Almaraz, 306 F.3d 1031, 1037 (10th Cir. 2002). But the instructions considered as a whole tend to exacerbate the erroneous admission of Jones' expert opinion. They stated that Jones was permitted to express his opinions "regarding investigation of conspiracies and robberies" based on his "knowledge, skill, experience, training or education," and that his testimony concerned "scientific, technical, or other specialized knowledge."

Although the jury was instructed that it was not required to accept the expert opinion testimony offered, the danger of such testimony on the subject of credibility is not that the jury will be misled into thinking the issue is outside its bailiwick, but that "the testimony of impressively qualified experts on the credibility of other witnesses is prejudicial and unduly influences the jury." Toledo, 985 F.2d at 1470. During his testimony, Jones sought to burnish his credentials. He told the jury that he had attended "specialized courses" including "the Reid school, which is a higher-level school of interrogation and interviewing." He stated that the Reid school trained him in "special tactics and ways to identify on deception in statements and truths in statements" and that the training was "sought-after . . . because of the caliber of that training you do get

-32-

towards that endeavor."

In light of the complete record before us, we conclude that Stanley has carried his burden of showing a reasonable probability that the result of his trial would have been different without the impermissible testimony. Although the prosecution presented a reasonable theory, the likelihood that the jury was unduly swayed by Jones' improper testimony—and would not have found Stanley guilty beyond a reasonable doubt absent that testimony—is high enough to undermine our confidence in the result of the trial. See Hasan, 526 F.3d at 665.

**C**

Having concluded that Stanley has satisfied the first three prongs of plain-error review, we must consider whether to exercise our "discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Begaye, 635 F.3d 456, 470 (10th Cir. 2011) (quotation omitted). "[A] plain error affecting substantial rights does not, without more, satisfy the . . . standard, for otherwise the discretion afforded by Rule 52(b) would be illusory." United States v. Olano, 507 U.S. 725, 737 (1993).

We hold that this case warrants reversal under this standard. As discussed supra, Stanley has shown a reasonable probability that but for the erroneously admitted testimony, he would not have been convicted. We have stated that the "key concern" in "considering whether to correct unobjected-to sentencing errors" at the fourth prong of plain error review is if "correct application of the sentencing laws would likely

-33-

significantly reduce the length of the sentence." United States v. Brown, 316 F.3d 1151, 1161 (10th Cir. 2003); see also United States v. Cordery, 656 F.3d 1103, 1108 (10th Cir. 2011) (applying this rule to correct a five-month sentencing discrepancy). We have also elected to reverse in several plain error cases in which the district court entered an impermissibly large restitution order. See United States v. Gordon, 480 F.3d 1205, 1212 (10th Cir. 2007) (collecting cases and rejecting government's argument on prong four). In contrast, we have declined to exercise our discretion in favor of defendants sentenced under a mandatory sentencing Guidelines regime who sought to challenge their sentences following the Supreme Court's holding that the Guidelines were merely advisory. We held that the mere fact of mandatory application during a time when the law required it did not offend "core notions of justice." United States v. Gonzalez-Huerta, 403 F.3d 727, 738-39 (10th Cir. 2005) (en banc).

The consequences of ignoring the error in this case may be significantly more severe than the sentencing and restitution cases cited above; upon retrial without Jones' testimony (assuming the other evidence remains roughly similar), there is a reasonable probability that Stanley will not be convicted at all. However, the Supreme Court has indicated that this factor standing alone does not necessarily compel reversal. See Olano, 507 U.S. at 737.

It is the nature of the error at issue in this case that leads us to conclude that ignoring it would offend core notions of justice and seriously affect the fairness, integrity, and public reputation of judicial proceedings. A law enforcement agent informed the jury

-34-

that he was specially trained in ferreting out lies, and the instructions the jury received from the district court essentially confirmed that claim. The agent testified that in his expert opinion the defendant's story was unworthy of belief and that the defendant's evasive behavior demonstrated guilt. Such testimony is intolerable under our system of jurisprudence, which has long recognized jurors' ability and sole responsibility to determine credibility. See Aetna Life Ins. Co., 140 U.S. at 88; Samara, 643 F.2d at 705. Perhaps even more troublingly, Jones' lengthy testimony was repeatedly incited by improper questions from the prosecutor, who inquired whether Jones believed the substance of Stanley's statements and mischaracterized those statements in asking whether they indicated that Stanley was guilty.

We cast no blame on the district court for the error that occurred in this case and warn the defense bar that reversal in the absence of contemporaneous objection is a rare exception rather than the rule. We nonetheless must conclude that Stanley has satisfied all four prongs of the plain error standard and is entitled to relief.

### III

For the foregoing reasons, we **REVERSE** and **REMAND** with instructions to **VACATE** Stanley Hill's convictions and sentence.