**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 19, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

No. 14-8049

JAMES KEITH BEIERLE,

Defendant - Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. No. 2:13-CR-00098-NDF-1)**

Robert T. Fishman, Of Counsel, Ridley, McGreevy & Winocur, PC, Denver, Colorado, for Defendant - Appellant.

Thomas Szott, Assistant United States Attorney, (Christopher A. Crofts, United States Attorney, and Stuart S. Healy, III, Assistant United States Attorney, on the brief), Cheyenne, Wyoming, for Plaintiff – Appellee.

Before **TYMKOVICH**, Chief Judge, **HARTZ**, and **BALDOCK**, Circuit Judges.

**HARTZ**, Circuit Judge.

A jury convicted Defendant James Beierle of being a felon in possession of a

firearm. *See* 18 U.S.C. § 922(g)(1). He was sentenced to 15 years' imprisonment after

the court found him eligible for a sentence enhancement under the residual clause of the Armed Career Criminal Act (ACCA), *see id.* § 924(e)(2)(B)(ii). Defendant raises three contentions on appeal: (1) he was denied due process when he was not present for a conference to settle jury instructions; (2) the district court committed plain error by permitting the deputy sheriff to whom he confessed to testify that there were no indications during the interview that Defendant was being untruthful; and (3) his sentence under the ACCA was unlawful. We reject Defendant's first two contentions and accept his third. Defendant's absence from the instruction conference did not deprive him of due process because he had nothing to contribute to the purely legal matters that were decided at the conference. Even if the admission of the deputy's testimony was error, Defendant failed to show prejudice in light of the overwhelming evidence of guilt. And Defendant's sentence must be set aside because the residual clause of the ACCA is unconstitutionally vague. *See Johnson v. United States*, 135 S. Ct. 2551, 2563 (2015). Exercising jurisdiction under 28 U.S.C. § 1291, we affirm Defendant's conviction, vacate his sentence, and remand to the district court for resentencing.

## I.     THE TRIAL

The trial was conducted in February 2014. The prosecution called four witnesses: Deputy Ryan Martinez of the Laramie County Sheriff's Office (LCSO), LCSO Deputy Kurt Wilson, LCSO Sergeant Mark Hollanbach, and Special Agent Steve McFarland of the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives. Deputy Martinez testified that on the night of January 13, 2013, he and another deputy went to Defendant's

house to interview him after receiving a disturbance call from Richard Redfern and Chris Covalt. When Defendant did not answer the door, the deputies went to see if he was in the shop building on the property. They never found Defendant; but while walking around, they found six spent shell casings for a .233 rifle: four casings next to the door of the shop and two casings 20 to 40 feet from the shop. The locations of the shell casings were consistent with the description of events provided by Redfern and Covalt.

Deputy Wilson testified that Defendant agreed to a recorded interview two days later. Defendant gave Wilson the following account of events: He had invited Redfern and Covalt to his house after meeting them at a truck stop. At the time, he and his young daughter were the only ones at home. Redfern brought his daughter to play with Defendant's daughter. But Redfern departed without taking her with him. When Defendant discovered that the daughter was still in the house, he was upset that Redfern had left her behind. Covalt had given Defendant his business card, so Defendant called him to have Redfern come back to pick his daughter up. Redfern called two hours later to say he was on his way.

The two girls had been in the house. But after Redfern called, Defendant brought them to the shop, where they were alone. When Redfern arrived, his daughter got into his car and Defendant sent his own daughter to the back of the shop. Defendant was angry. Redfern started talking "mumbo- jumbo," and Defendant picked up a rifle he had hidden inside the door of the shop. Aplt. App., Vol. I at 304. Wanting Redfern off his property, Defendant fired several shots from the rifle. The first were fired toward a row

3

of trees and the others toward a pasture. After these first rounds were fired, Redfern got into his car and drove off. But Redfern then stopped his car 150 to 200 feet away. Defendant—standing about 30 feet in front of his shop—fired two more rounds past the car into the pasture. Defendant secured the gun in his gun safe. He described the gun as a .233 assault rifle.

When repeatedly asked if Redfern threatened him during this encounter, Defendant said no. When told that Redfern had accused him of pointing the gun at Redfern's face, he denied that and said he never aimed at Redfern. Wilson testified that Defendant was not nervous or frightened when discussing the events and that he had no reason to disbelieve Defendant's confession. Defendant also provided a written statement.

Two weeks later, on January 30, Wilson and Sergeant Hollanbach returned to Defendant's property to collect the rifle for evidence. Defendant led them to the gun safe in his garage and retrieved the rifle, stating, "This is what you're here to get." *Id*. at 311 (internal quotation marks omitted).

Hollanbach also testified about the January 30 encounter. He added a few details to Wilson's account. After he and Wilson obtained the rifle, he told Defendant that he thought Defendant had a felony conviction. Defendant acknowledged that he did. When Hollanbach asked Defendant how he got the gun, Defendant said that he used his then-wife's social security number to purchase it. Defendant said in a written statement, "This gun was left behind by my ex-wife and at the evening in question when all of the trash

4

talk became threatening, I grabbed and shot this gun." *Id.*, Vol. II at 362 (internal quotation marks omitted). The next day, Defendant came to Hollanbach's office and explained in more detail how he obtained the rifle. He told Hollanbach, "[P]rior to [your] showing up the day before [I] had gotten rid of the knots in [my] belly . . . and since [you] had showed up . . . the knots [have] returned to [my] belly." *Id.* at 366.

Agent McFarland testified that he had obtained records confirming that the rifle had been purchased using the name and social security number of Defendant's ex-wife.

Before the close of the government's case, counsel met with the judge for an in-chambers conference to discuss jury instructions. One related to the fact that Defendant had originally been charged with aggravated assault in state court. (The charge was dismissed after the federal prosecution was initiated.) Defense counsel had told the jury in his opening statement that Defendant would testify; and the government, intending to impeach Defendant with evidence of the state charge, sought an instruction limiting the jury's use of this evidence. The court agreed to the limiting instruction, ruling that the evidence would be admissible to impeach Defendant if he took the stand.

Defendant testified that his story to the officers was fabricated and that an employee named Nico Santos had actually fired the rifle. He explained that Redfern had made a threatening call to him before returning to the property. He became concerned for the safety of his daughter, took her to his shop, and brought three employees (including Santos) down from his office to the shop. When Redfern arrived, he made further threats to Defendant, so Defendant took his daughter and went to his office. Santos told him, "I

will handle this," and left the shop. *Id.* at 435 (internal quotation marks omitted). Defendant then heard some screaming, a rapid fire of gun shots, some silence, and then another four or five shots. After the shooting, Santos ran back in and told the other employees they had to leave, which they did. Defendant did not actually see Santos take the gun and did not know where Santos left the gun until he found it in the shop a few days later. When he found it, he asked a friend, Kayce Berg, to put it in the gun safe for him. He said that the gun belonged to his ex-wife and that the only time he handled it was when he gave it to Wilson. Defendant also produced a recording of a call he received from Redfern after the shooting. The defense did not play it for the jury, but the government did. The voice on the recording said: "You better . . . put your guard up now, because you will never . . . ever shoot a gun next to my head again. . . . You would never . . . do that in front of my daughter again." Aplt. Supp. App. (Audio Recording, Tr. Ex. 16 B-f).

On direct examination Defendant did not deny making the statements to the officers. But he claimed that he had been protecting his employees. He explained, "Well, I don't know anybody's situation. I have made boo-boos in my life. I don't know what anybody else has or has not done and I wasn't going to point the finger until I could talk with my employees." *Id.*, Vol. II at 440. He said that at the time of the interview he thought the situation was not "going to grow into this," *id.* at 496, but would be handled locally "between the two parties and the sheriff's department," *id.* at 450. On cross-examination he admitted that he told no one about this defense until two weeks before

6

trial. Defendant provided no explanation for why it took so long for him to tell this version of the story, especially after facing serious charges, except that he had not been able to track down the individuals who he said were actually to blame.

Erika Luna, a former employee of Defendant's, testified that she was at Defendant's place the night of the incident and that Santos fired the rifle while Defendant hid to protect his daughter. On cross-examination the government asked Ms. Luna when she next heard from Defendant after the incident; she responded that she had not spoken to him until he called her four or five weeks before trial. Three other witnesses briefly testified for the defense. Defendant's father testified that the gun safe where the rifle was stored was his and that he had left it at Defendant's residence after a recent move. One of Defendant's friends testified that he had never seen him with a gun in the five years that he had known him. And Berg testified that sometime in January, Defendant had asked him to "take care of [the gun] for him," so he put it in the gun safe. *Id.* at 518.

## II.    DISCUSSION

### A.    Absence from Instruction Conference

Before the government rested its case in chief, the district court conducted an in-chambers conference "to cover the final evidentiary instructions, final form of verdict, take any objections and address those." *Id.*, Vol. I at 313. Both counsel attended. One instruction proposed by the government concerned Fed. R. Evid. 404(b), which states that evidence of a person's prior bad acts may be admissible for a purpose other than "to prove a person's character in order to show that on a particular occasion the person acted

7

in accordance with the character." If such evidence is admitted, the court must give upon request a "limiting instruction . . . caution[ing] the jury to consider the evidence only for the limited purposes for which it is admitted and not as probative of bad character or propensity to commit the charged crime." *United States v. Mares*, 441 F.3d 1152, 1157 (10th Cir. 2006). Because of the defense opening statement, the government expected Defendant to testify that he had lied in his police interviews and that another individual actually shot the gun. The government explained that if Defendant so testified, it planned to impeach his credibility with evidence of the aggravated-assault charge against him in state court. Defense counsel unsuccessfully objected to the admission of the evidence. The court ruled that it was admissible "as probative of credibility," Aplt. App., Vol. II at 329, and agreed to give the limiting instruction.

Defendant did not request to be at the conference and at no point did defense counsel object to his absence. Defendant now argues that he had a constitutional right to attend. We disagree.[1]

The constitutional right of the defendant to be present at trial is rooted in both the Confrontation Clause and the Due Process Clause. *See United States v. Gagnon*, 470 U.S. 522, 526 (1985) (per curiam). The Confrontation Clause assures the defendant of "the privilege to confront one's accusers and cross-examine them face to face."

---

[1] The parties dispute which standard of review should apply since counsel for Defendant did not object to his absence from the conference. Because we hold that Defendant had no constitutional right to attend the conference, Defendant's challenge fails under either de novo or plain-error review.

*Snyder v. Massachusetts*, 291 U.S. 97, 106 (1934), *overruled in part on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964).  For trial proceedings other than the presentation of evidence, the Due Process Clause governs.  *See Gagnon*, 470 U.S. at 526.  Under the clause a criminal defendant has the "right to be present at a proceeding whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge."  *Id.* (internal quotation marks omitted).  That is, "[t]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, *and to that extent only*."  *Id*. (emphasis added) (internal quotation marks omitted).

Three Supreme Court opinions illustrate the scope of due process in this context.  In *Snyder* the Court held that a defendant's exclusion from the jury's viewing of the crime scene was consistent with due process.  *See* 291 U.S. at 108–22.  Although if the defendant were present, he could be sure that the jury had seen the right place and nothing had been altered, "[o]pportunity was ample to learn whatever there was need to know," *id.* at 109.  He could easily "examine the bailiffs at the trial and learn what they had looked at," could view the scene at another time with counsel, and could inquire "of witnesses in court and of counsel out of court."  *Id.* at 108.  In *Gagnon* the Court held that the defendant had no constitutional right to be present at an in camera discussion between a juror, the judge, and defense counsel regarding the juror's concern that the defendant had been drawing pictures of the jurors.  *See* 470 U.S. at 524, 527.  The Court said that the defendant "could have done nothing had [he] been at the conference, nor would [he]

9

have gained anything by attending." *Id*. at 527. In *Kentucky v. Stincer*, 482 U.S. 730, 747 (1987), the Court rejected the argument that the defendant had a due-process right to be present at a hearing to determine the competency of two child witnesses. The trial judge and counsel had questioned each child "to determine if she were capable of remembering basic facts and of distinguishing between telling the truth and telling a lie." *Id*. at 733. The Court expressed the due-process right as follows: "[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Id*. at 745. The Court noted that there was no questioning of the girls at the hearing "regarding the substantive testimony that [they] would have given during trial," *id.*, and said that the defendant "ha[d] given no indication that his presence at the competency hearing in this case would have been useful in ensuring a more reliable determination as to whether the witnesses were competent to testify," *id*. at 747.

In accordance with these principles, we have held "that the exclusion of a defendant . . . from the courtroom during argument on a question of law does not violate defendant's constitutional right to be present at every step of the proceedings." *Deschenes v. United States*, 224 F.2d 688, 693 (10th Cir. 1955). In particular, in this circuit a defendant need not be present at a jury-instruction conference. *See Larson v. Tansy*, 911 F.2d 392, 395 (10th Cir. 1990). "The jury instruction conference traditionally encompasses purely legal issues and . . . it will be a rare case where a defendant can establish that his presence was essential to his opportunity to present his defense." *Id*.

Defendant argues that he had a due-process right to be present at the instruction conference because he would have gained information—the prosecution's plan to impeach him by asking about his assault charge—that would have "'contributed to [his] opportunity to defend himself against the charges.'" Aplt. Br. at 17 (quoting *Stincer*, 482 U.S. at 744 n.17). He asserts that "[h]is presence would have allowed him to weigh the government's trial strategy when making his own decision whether to testify and subject himself to cross-examination, and his presence would have allowed him to consider how the government's trial strategy might be dealt with in the event he did decide to take the stand." Aplt. Br. at 19. But due process guarantees his presence only when his presence would be helpful at the proceeding he seeks to attend—that is, only "if his presence would contribute to the fairness of the procedure." *Stincer*, 482 U.S. at 745. The "procedure" whose fairness is at issue is the procedure not attended by the defendant. In *Snyder*, *Gagnon*, and *Stincer* the Supreme Court's focus was on whether the defendant could have assisted at the proceeding (the jury view, the juror questioning, and the competency hearing) from which the defendant was absent. Due process does not give a defendant a right to be present at a proceeding just so he can gather information for later use. That proposition has been clear since *Snyder*, where the Supreme Court pointed out that a defendant absent from the jury's view of a crime scene could view the scene at a different time and could determine what happened during the view by inquiring "of witnesses in court and of counsel out of court." 291 U.S. at 108. Defendant could have learned (and may well have learned) from his counsel all he needed to know about what

11

happened at the instruction conference. If he was not adequately informed, that is a matter to be dealt with under the constitutional guarantee of effective assistance of counsel, not the Due Process Clause.

Because the instruction conference was devoted to purely legal issues, and because Defendant makes no argument that his presence would have contributed to the fairness of the conference, Defendant had no due-process right to attend.

**B.     Admission of Testimony on Credibility**

Defendant challenges the admission of Wilson's testimony opining on the credibility of Defendant during his interview. Early in his direct examination, Wilson testified to his expertise in interviewing witnesses through training and experience:

> Q. Do you -- do you engage in specialized training every year?
> A. Yes.
> Q. Is that part of your POST -- POST training, POST-certified training?
> A. Yes, it is, a minimum of 20 hours a year.
> Q. Have you been trained in interview techniques?
> A. Yes, I have.
> Q. Have you conducted interviews of potential witnesses to crimes?
> A. Yes.
> Q. Have you conducted interviews with potential defendants?
> A. Yes.
> Q. How many interviews have you conducted, approximately, over your 22 years with the SO?
> A. Hundreds. I -- a lot.
> Q. Do you feel pretty comfortable interviewing individuals who are suspects or witnesses to crimes?
> A. Yes, I do.

Aplt. App., Vol. I at 292–93. He also testified that he had known Defendant for 10 to 12 years.

12

Later Wilson was asked to evaluate Defendant's statement to him:

> Q. You testified that you've participated in hundreds of interviews; is that correct?
> A. Yes.
> Q. Was there any point during your conversation with Mr. Beierle when he appeared nervous to you?
> A. No.
> Q. Any point when he appeared frightened?
> A. No.
> *Q. Was there any indication to you during the time of your interview with him that he was misleading you or being untruthful?*
> *A. No.*

*Id.* at 307–08 (emphasis added). Defense counsel did not object to this testimony. Defendant now challenges the prosecutor's last quoted question. He claims that Wilson's testimony "violated the well-settled rule that an expert may not opine about another witness's credibility." Aplt. Br. at 24.

Because Defendant did not contemporaneously object to Wilson's testimony, we review for plain error. *See United States v. Hill*, 749 F.3d 1250, 1257 (10th Cir. 2014). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id*. at 1257–58 (internal quotation marks omitted). We need not decide whether admission of the evidence was error or whether any error was plain. Defendant has the burden to prove that each of the four requirements is satisfied; failure on any one requires affirmance. *See United States v. Vazquez*, 555 F.3d 923, 930 (10th Cir. 2009). And here Defendant fails on the third requirement. To show that admission of the challenged evidence affected his substantial rights, Defendant must establish "a

13

reasonable probability that but for the error claimed, the result of the proceeding would have been different." *Hill*, 749 F.3d at 1263 (internal quotation marks omitted). He has not met that burden.

The evidence in favor of conviction was extremely strong. Two officers testified about three interactions with Defendant in which he admitted to possessing the rifle. The jury also received a recording of the interview with Wilson and two written statements by Defendant admitting to firearm possession.

True, the mere repetition of Defendant's account, even to law-enforcement officers, hardly ensures its truthfulness. For instance, one could have serious doubts about his assertion that he never aimed his gun at Redfern. But his attempt in his trial testimony to discredit his admissions that he had (and used) the gun stretches credulity too far. It is apparent that when he was speaking to the officers, his sole concern was an assault charge, which he thought he had deflected (he "had gotten rid of the knots in his belly," Aplt. App., Vol. II at 366) by asserting that he never aimed at Redfern or his daughter. He was not fearing a firearms charge, thinking that the incident would be resolved "between the two parties and the sheriff's department," *id.* at 450. But the "knots . . . returned" when he realized that the officers were looking into a felon-in-possession charge, so he had to concoct a different story. *Id.* at 366.

We mention some of the more serious problems with the story Defendant provided at trial. To begin with, Defendant's description to the officers of where he fired his gun (first a few shots near the shop and then two shots from about 30 feet away) was

14

corroborated by the physical evidence.  But if his trial testimony is correct, he could not have seen from where Santos fired the gun.

Also striking is the nonsensical excuse he gave at trial for giving false statements to the officers.  He said that he was trying to protect Santos by taking the blame himself.  But what was his motive for doing so?  His explanation—"Well, I don't know anybody's situation.  I have made boo-boos in my life.  I don't know what anybody else has or has not done and I wasn't going to point the finger until I could talk with my employees," *id.* at 440—has no ring of truth, hollow or otherwise.  And how would it help Santos for him to state falsely (1) that he had used his wife's social security number to buy the gun for himself, (2) that the visitors had not threatened him before the incident, and (3) that he personally put the gun in the safe?  And why would he delay telling the truth while he tried to track Santos down?  Delaying to look for Santos would make more sense if his motive was not to protect Santos but to be sure that Santos could not be found before Defendant falsely put the blame on him.

As icing on the cake, we note the tape (offered by Defendant into evidence) of Redfern's post-incident call accusing Defendant of firing at him.  Defendant offers no reason for Redfern to accuse him if Santos was the true assailant.

Defendant relies on *United States v. Hill*, 749 F.3d 1250 (10th Cir. 2014), in which we reversed a conviction on plain-error review.  But this case bears little resemblance to *Hill*.  True, our reversal in that case was based on the improper admission of expert testimony by a law-enforcement officer regarding the defendant's credibility when

15

interviewed by the officer. But in this case the evidence of guilt was much stronger; the allegedly improper opinion testimony was a single, unelaborated sentence, not the extensive analysis presented in *Hill*; and, unlike in *Hill*, where the defendant did not testify, the jury had more than ample opportunity to assess Defendant's credibility during his trial testimony. In our view, Defendant has not shown that his substantial rights were prejudiced by the admission of Wilson's testimony.

### C.    ACCA Claims

The government concedes that the Supreme Court's recent decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015), requires setting aside Defendant's sentence because it was imposed under the unconstitutional ACCA residual clause. We agree. Defendant's sentence must be vacated.

### III.    CONCLUSION

We AFFIRM Defendant's conviction, VACATE Defendant's sentence, and REMAND to the district court for resentencing.

**HARTZ,** Circuit Judge, concurring:

I write separately to explain why I believe that the challenged opinion testimony of Officer Wilson was clearly inadmissible. First, it is settled law in this circuit that a law-enforcement officer cannot provide expert testimony on whether a defendant was deceptive during an interview. Second, opinion testimony must be treated as expert testimony if it is founded on the professional training and experience of the witness, regardless of whether the witness is formally offered as an expert on the matter.

The first proposition was established in *United States v. Hill*, 749 F.3d 1250 (10th Cir. 2014), where we stated the general rule that expert testimony about the credibility of a witness is inadmissible. As we explained, "Such testimony: (1) usurps a critical function of the jury; (2) is not helpful to the jury, which can make its own determination of credibility; and (3) when provided by impressively qualified experts on the credibility of other witnesses is prejudicial and unduly influences the jury." *Id*. at 1258 (internal quotation marks omitted). In *Hill* an officer testified about the defendant's credibility in an interview with police. *See id.* at 1263. The interrogating officer testified that he had been trained to identify "deception in statements and truths in statements," and had conducted over a thousand interviews as an FBI agent. *Id*. at 1255 (internal quotation marks omitted). He was asked, "based on his training and experience," what he thought of the defendant's truthfulness in the interrogation, and the officer provided detailed explanations about the defendant's behavior that made the officer think he was lying. *Id*. at 1256 (brackets and internal quotation marks omitted). Although defense counsel did

not object at trial, we held that allowing this line of inquiry was plain error. *See id*. at 1263. We noted that other circuits are in accord: it is impermissible for an expert to opine on the credibility of another witness's statements. *See id.* at 1260 (collecting cases).[1]

The second proposition follows from the Federal Rules of Evidence, as well as precedent. The rules do "not distinguish between expert and lay *witnesses*, but rather between expert and lay *testimony*." Fed. R. Evid. 701 advisory committee's notes, 2000 amendments. The provisions governing expert testimony cannot be evaded simply by declining to offer the witness as an expert. *See United States v. Charley*, 189 F.3d 1251, 1257, 1260, 1266–67 (10th Cir. 1999) (testimony of Dr. Ornelas, who was not offered as an expert, was inadmissible expert testimony to the extent it vouched for truthfulness of statement by child victim). A lay witness is not permitted to give expert testimony. Fed. R. Evid. 701 sets forth the proper scope of lay opinion testimony:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) *not based on* scientific, technical, or other *specialized knowledge* within the scope of Rule 702.

(emphasis added). Thus, an opinion is not properly considered lay opinion if it is based on "specialized knowledge" and therefore covered by the rule on expert opinion testimony, Fed. R. Evid. 702. In particular, "'Knowledge derived from previous

---

[1] *Hill* recognized that psychiatric testimony may sometimes be admissible on the issue of credibility. *See* 749 F.3d at 1262. But that exception has no application here.

professional experience falls squarely within the scope of Rule 702 and thus by definition outside of Rule 701.'" *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1215 (10th Cir. 2011) (brackets omitted) (quoting *United States v. Smith*, 640 F.3d 358, 365 (D.C. Cir. 2011) (FBI agent's testimony interpreting slang used in recorded conversations should not have been admitted as lay testimony)). A law-enforcement officer's opinion based on police training and the experience of conducting hundreds of interviews easily fits that description.

The inescapable conclusion is that an officer's opinion regarding a witness's deceptiveness during an interview is inadmissible if the opinion is based on the officer's professional training and experience. Such an opinion is not admissible as lay testimony under Rule 701, and it is barred as expert testimony by *Hill*.

The government contends that Wilson's statement that Defendant was not being misleading or untruthful during his interview was not expert testimony because Wilson's opinion was based on his personal knowledge of Defendant rather than his training and experience. There is some truth to that contention. The prosecutor elicited at trial that Wilson and Defendant had known each other for years. But he also elicited that Wilson had extensive training and experience in interviewing prospective defendants. And when the prosecutor asked Wilson, "Was there any indication to you during the time of your interview with him that he was misleading you or being untruthful," Aplt. App., Vol. I. at 308, he had reminded the jury only seconds earlier that Wilson had "participated in hundreds of interviews"; but the prosecutor had not reminded the jury that Wilson had known Defendant for 10 to 12 years. (The testimony that Wilson had known Defendant

-3-

for 10 to12 years came 14 pages earlier in the transcript than the "untruthfulness"

question.)  Also, when emphasizing in final argument the testimony by Wilson that

Defendant had not seemed deceitful, the prosecutor gave at least equal billing to Wilson's

training and experience in conducting interviews as he did to Wilson's having known

Defendant for 10 to12 years.  The relevant part of the closing was:

> Sergeant Hollanbach and Deputy Wilson, remember when you think about this, too, *47 years of combined law enforcement experience, 20 hours a year of continuing training, hundreds and hundreds and hundreds of interviews of witnesses and defendants* and they both testified, they said, "Look, when I talked to him"—and remember, Kurt Wilson knows the defendant.  He knows him from, according to the defendant, personal contacts and then later the defendant admitted also other kinds of contacts.
>
> But he knows the defendant personally.  He's known him for 10 years, 10 to 12 years he said.  *But all of these interviews they have done, hundreds and hundreds and hundreds* and nothing that he told them on the—on the 15th or on the 30th or on the 31st ever indicated to them in any way that he was being deceitful.  Nothing.  So that's important to think about when we go through these.

Aplt. App., Vol. III at 553–54 (emphasis added).  I think it telling that the prosecutor

(incorrectly) indicated that Hollanbach had also testified that Defendant did not appear to

be deceitful.  Hollanbach's opinion could only be based on his training and experience

because he had not known Defendant personally.  Yet the prosecutor wanted the jury to

rely on that opinion.[2]

---

[2] Even if Wilson's testimony had been based solely on his personal knowledge of Defendant, it would not have passed muster.  Lay witness testimony on the credibility of a witness's statement is inadmissible.  Perhaps it is not as impressive as expert opinion, but it still "usurps a critical function of the jury [and] is not helpful to the jury, which can make its own determination of credibility." *Hill*, 749 F.3d at 1258 (internal quotation marks omitted); *see United States v. Forrester*, 60 F.3d 52, 63 (2d Cir. 1995) (officer testimony on credibility was not permitted under Fed. R. Evid. 701, which governs

I also cannot accept the government's argument that defense counsel "opened the door" to testimony regarding the veracity of the confession when he told the jury during opening statement that Defendant would take the stand and repudiate his confession. The argument misconceives the open-the-door doctrine. Counsel could open the door by saying something that made relevant what would otherwise be irrelevant. The government might then be permitted to respond on that otherwise-irrelevant subject. *See, e.g., United States v. Tenorio*, No. 15-2037, 2015 WL 9466867, at *4 (10th Cir. Dec. 29, 2015) (defendant opened door to evidence that he took polygraph test); *United States v. Segal*, 852 F.2d 1152, 1155–56 (9th Cir. 1988) (in prosecution for failing to file currency-transaction reports, government could put on evidence of defendant's cocaine sales after subject was brought up in defendant's opening statement). Or counsel could open the door by referring to evidence that is relevant but would otherwise be inadmissible, such as a hearsay statement. The government might then be permitted to respond to that hearsay statement as if it were admissible evidence, such as by impeaching the declarant or offering other hearsay necessary to put in context the hearsay mentioned in the opening statement. *See United States v. Lopez-Medina*, 596 F.3d 716, 731–36 (10th Cir.

opinion testimony by lay witnesses, because "the credibility of witnesses is exclusively for the determination by the jury, and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial" (brackets and internal quotation marks omitted)); *cf. Charley*, 189 F.3d at 1267 n.21 (noting that some courts have rejected testimony vouching for the credibility of a witness under Fed. R. Evid. 608(a)(1) (limiting opinion evidence on character for truthfulness) or 403 (grounds for exclusion of relevant evidence)). A lay witness could testify about whether another person was nervous and the like, but the government has not cited any case authorizing lay testimony that a person was telling the truth when making a statement.

2010) (admission of hearsay upheld under rule of completeness after defense counsel elicited inadmissible evidence).

In this case, however, defense counsel's opening statement did not make relevant anything that was not already relevant. Even without that statement, evidence regarding the truthfulness of Defendant's confession would be relevant. Nor did defense counsel's statement refer to any relevant evidence that would be inadmissible. For example, if counsel had asserted in his opening statement that the officers did not believe Defendant when he confessed (evidence that should be barred because it would be a witness's opinion of the credibility of a statement by someone else), the door might be opened to testimony by the officers about whether they believed Defendant when he confessed. In short, nothing in defense counsel's opening statement changed the rules of the game.[3] The cases cited by the government are inapposite. It has pointed to no precedent that permits opinion testimony on the credibility of a witness's statement merely because the witness disavows or departs from the prior statement.

For these reasons I believe that Defendant carried his burden of showing that admission of Wilson's opinion testimony was error and the error was plain. But affirmance is nevertheless required because he failed to show prejudice.

_____

[3] To be sure, when a witness's character for truthfulness has been attacked (as might be done in an opening statement, *see United States v. Santiago*, 46 F.3d 885, 891–92 (9th Cir. 1995)), the opposing party can put on evidence of the witness's character for truthfulness. *See* Fed. R. Evid. 608(a). But that rule is not involved here; when defense counsel said that Defendant's confession was false, he was not attacking Defendant's character for truthfulness. And when the government questioned Wilson, it was not to establish that Defendant had a truthful character. To the contrary, the defense wanted the jury to *believe* Defendant's *testimony* and the government had the opposite aim.