**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

FRANCIS HARRY DISHMON,

      Defendant - Appellant.

Nos. 15-5068, 15-5069
and 15-5070
(D.C. No. 4:13-CR-00189-JED-1)
(D. N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **O'BRIEN**, and **PHILLIPS**, Circuit Judges.

Francis Harry Dishmon attempted to rob a bank. While fleeing, he caused a fatal

car accident. He managed to avoid being held criminally responsible for the fatality but

the jury found him guilty of attempted robbery. He wants us to reverse his conviction,

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). These cases are therefore submitted without oral argument.

    This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished). *Id.*

claiming the prosecutor made improper remarks in closing argument. Whether or not the prosecutor's remarks were improper, reversal is not warranted.[1]

## I. Background

On the morning of August 28, 2013, Dishmon, wearing a white t-shirt, entered IBC Bank in Miami, Oklahoma. He asked a teller, Jose Fonseca, for the location of the restroom. After using the restroom, he left the bank.

Dishmon returned to the bank later that morning, this time wearing a blue shirt. He went to the center island where he appeared to write something down. He then approached head teller Elaine Wagner at the counter, handed her a white napkin, and told her to read it. The napkin said "100s and 50s." (R. Vol. 2 at 130.)[2] When Wagner said "I'm sorry, I can't see it," Dishmon replied, "[Y]ou don't understand, you're endangering your life and the life of your customer, now give me your 100s and 50s." (*Id.*) Because Wagner had been working at the drive-thru window, she told Dishmon she had no money

_____

[1] At the time of the attempted robbery, Dishmon was on federal supervised release in Florida and Alabama. A condition of his supervised release prohibited him from committing a new crime. Jurisdiction of the supervised release cases was transferred to the Northern District of Oklahoma and assigned to the same judge who presided over his attempted robbery trial. Due to his attempted robbery conviction, the judge revoked his supervised release in each case and sentenced Dishmon to concurrent 24 month terms. Dishmon filed a notice of appeal in each supervised release case (Appeal Nos. 15-5068, 15-5070) and those appeals were consolidated with his appeal in the attempted robbery case (Appeal No. 15-5069). His argument in Appeal Nos. 15-5068 and 15-5070 is narrow—because the attempted robbery conviction must be reversed due to the prosecutor's improper closing argument, the revocations of his supervised release and corresponding sentences must also be reversed because they were based on the attempted robbery conviction. Because we affirm his attempted robbery conviction in 15-5069, his revocations and sentences in Appeal Nos. 15-5068 and 15-5070 are also affirmed.

[2] All references to the record are to the record in Appeal No. 15-5069.

at the counter. When Dishmon said he did not believe her, Wagner pulled out the money drawer to show him it was empty. She told him she would retrieve money from the drive-thru station. As she turned to do so, she made eye contact with Jessica Webb, another bank employee, and nodded. Believing something was amiss, Webb pressed the panic button under her desk. When Wagner returned from the drive-thru station, Dishmon was gone.

Dishmon ran to his vehicle and sped away. While heading north on a two-lane highway, he tried to pass a tractor-trailer being driven by James Wivell. To do so, he entered the southbound lane of traffic, forcing two vehicles traveling south off the road. In attempting to avoid a head-on collision with one of those southbound vehicles, Dishmon swerved back into the northbound lane and collided with Wivell's truck. As a result of that contact, Dishmon's vehicle spun out in front of Wivell's truck. To avoid another collision with Dishmon's vehicle, Wivell swerved to the left. He then made a hard steer to the right to stay on the road. The truck's weight shifted, causing it to tip over onto the driver's side. It slid into the median where Wivell was impaled and killed by a guardrail.

When law enforcement officers arrived on scene, Dishmon could not be found. They eventually discovered him hiding in the tall weeds on the side of the road. He initially told officers his name was Thomas Burke.[3]

---

[3] Dishmon took the stand and provided his own convenient version of events. While convoluted, his story basically came down to this. He decided to open a catering

(Continued . . .)

- 3 -

Dishmon was indicted for attempted bank robbery in violation of 18 U.S.C. § 2113(a) (Count 1) and killing a person while attempting to avoid apprehension for the attempted bank robbery in violation of 18 U.S.C. § 2113(a) and (e) (Count 2). At trial, Dishmon attempted to persuade the jury that Wagner, due to three medications she took to treat fibromyalgia, confused his innocent actions at the bank for an attempted robbery. He also presented evidence that he was not the sole cause of Wivell's death.[4] The jury

_____

business. He contacted a man selling catering equipment on Craigslist and agreed to meet him in a store parking lot. The store happened to share a parking lot with the bank. While he waited in the lot for the man to arrive, he had to use the restroom. He entered the bank, used the restroom, and returned to his vehicle. Because the man was running late, he decided to get something to eat. He spilled food on his shirt so he changed it. Still waiting, he decided to open a business account with the bank. He reentered the bank and approached Wagner, who appeared to be "in her own world," with a deposit slip. (R. Vol. 2 at 471.) He said, "Hi. How are you doing? I would like to look into opening a business account. How much would it be?" (*Id.*) Wagner responded, "N[igger], what are you talking about?" (*Id.*) Upset, he left the bank and sat in his car to contemplate what had just happened. He eventually exited the parking lot, heading north to find a different location to meet the man selling the catering equipment. He denied speeding. When he came upon Wivell's tractor-trailer, he decided to pass it. While he was passing, Wivell's truck sped up and hit his vehicle, causing it to spin. He said the next thing he remembers is the police placing him in handcuffs.

[4] Dishmon's accident reconstructionist testified that other factors, besides Dishmon, "caused the perfect storm . . . for a bad event to occur." (R. Vol. 2 at 444.) Those factors included: (1) Wivell's blood alcohol concentration (.02) exceeded the federal limit for commercial drivers; (2) Wivell increased his speed from 65 mph (the posted speed limit) to 69 mph in the seconds before the crash, and (3) the guardrail which impaled Wivell was substandard because it did not contain the required safety devices on its ends to prevent it from becoming a spear. Dishmon also highlighted that the doctor who performed Wivell's autopsy ruled the cause of death an "accident" rather than a "homicide." (*Id.* at 407-08.) The government countered most of this evidence: (1) the doctor who performed the autopsy testified Wivell's blood alcohol concentration could have resulted from post-mortem decomposition of his body and his diabetes; (2) Wivell's fiancée testified he did not drink; (3) the government's accident reconstructionist testified Wivell's increased speed was due to the downward grade of the road; and (4) the autopsy

(Continued . . .)

- 4 -

found Dishmon guilty on Count 1 but could not reach a verdict on Count 2. The government ultimately dismissed Count 2. Dishmon was sentenced to 30 years imprisonment to run consecutive to the sentences he received for violating his supervised release. *See supra* n.1.

## II. Discussion

In arguing the prosecutor made improper closing argument, Dishmon concedes our review is for plain error because he did not object at trial. *United States v. Fleming*, 667 F.3d 1098, 1103 (10th Cir. 2011). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Beierle*, 810 F.3d 1193, 1200 (10th Cir. 2016) (quotation marks omitted). Dishmon "has the burden to prove each of the four requirements is satisfied; failure on any one requires affirmance." *Id.*

Evaluating a claim of prosecutorial misconduct is a two-step process. *Fleming*, 667 at 1103. First we ask "whether the conduct was, in fact, improper." *United States v. Oberle*, 136 F.3d 1414, 1421 (10th Cir. 1998) (quotation marks omitted). If so, we then determine whether reversal is warranted. *Id.* "[R]eversal in the absence of contemporaneous objection is a rare exception rather than the rule." *United States v. Hill*,

---

doctor testified his conclusion was a medical one, not a legal one. It did not present any evidence rebutting the condition of the guardrail. While it is impossible to determine with any certainty what transpired in the "black box" of jury deliberations, *United States v. Benally*, 546 F.3d 1230, 1233 (10th Cir. 2008), this lack of rebuttal evidence may explain the jury's inability to reach a verdict on Count 2.

749 F.3d 1250, 1267 (10th Cir. 2014).

The dispute in this case centers on remarks the prosecutor made in closing argument contrasting his role with that of the judge, defense counsel, and jury:

> Now, you know, I have to say that throughout the course of this week, my job has probably been and probably always will be one of the easier jobs in this courtroom and one of the easier jobs in this courthouse.
>
> The judge, he's got a very difficult job. He's got to give you the law. He's got to call the objections, the balls and strikes, what's legal, what's not legal. That is very difficult.
>
> Mr. Lynn, the defense attorney, he has to represent the defendant. That is very difficult when you have the thumb of the United States government coming down. When it's the United States government versus Francis Harry Dishmon, that is very hard.
>
> You, ladies and gentlemen of the jury, have a very difficult task, to weigh the law, the facts and the evidence and apply them as you see fit. That's hard. *But you see, my job, all I have to do, all I'm paid to do is give people the facts. That's all there is. Call people on that witness stand, admit exhibits, ask questions. Don't spin it this way, don't turn it that way, that's not what I'm paid to do. I'm paid to just give you the facts.*

(R. Vol. 2 at 572-73 (emphasis added).) According to Dishmon, by telling the jury that his job is to present "the facts" and not to "spin it this way" or "turn it that way," the prosecutor improperly (1) placed his own integrity before the jury and (2) vouched for the credibility of his witnesses. *See United States v. Bowie*, 892 F.2d 1494, 1498 (10th Cir. 1990) ("It is error for the prosecution to personally vouch for the credibility of its witnesses."); *United States v. Ainesworth*, 716 F.2d 769, 771 (10th Cir. 1983) (a prosecutor may not "place his own integrity and credibility in issue").

Dishmon's argument has at least superficial appeal. A "fact" is defined as, among

other things, "something that truly exists or happens: something that has actual existence" or "a true piece of information." http://www.merriam-webster.com/dictionary/fact; *see also* Black's Law Dictionary (10th ed. 2014) (defining "fact" as, *inter alia*, "[s]omething that actually exists; an aspect of reality"). In other words, a "fact" connotes "truth." Therefore, a reasonable interpretation of the prosecutor's statements about being paid to "just give you the facts" is that his evidence, including the testimony of his witnesses, is true and indeed his only job is to present the truth. Such argument may be improper if it puts the prosecutor's integrity before the jury and amounts to vouching for the credibility of the government's witnesses.

But context matters. *United States v. Lopez–Medina*, 596 F.3d 716, 738 (10th Cir. 2010) ("When evaluating allegedly inappropriate remarks of counsel for plain error, we must view the remarks in the context of the entire trial.") (quotation marks omitted). After telling the jury "all I'm paid to do is give people the facts," the prosecutor mentions "[c]all[ing] people on that witness stand, admit[ting] exhibits, ask[ing] questions." (R. Vol. 2 at 572.) These actions refer to the presentation of evidence, not facts. The jury was told so at the beginning of trial and again prior to closing argument.[5] The context,

-----

[5] Prior to the presentation of evidence, the jury was instructed: "The evidence from which you will find the facts will consist of the testimony of witnesses, documents, and other things received into the record as exhibits, and any facts the lawyers agree or stipulate to, or that the Court may instruct you to find." (R. Vol. 1 at 233.) Prior to closing argument, the jury was again instructed: "The evidence in this case includes only what the witnesses said while they were testifying under oath, the exhibits that I allowed into evidence, and any stipulations that the lawyers agreed to." (*Id.* at 240.)

therefore, reveals the prosecutor meant to say "evidence" rather than "facts," something the jury likely understood.

Fortunately, we need not decide whether there was error. Assuming error, Dishmon has not shown the error affected his substantial rights. *See Fleming*, 667 F.3d at 1103 (on plain-error review, "reversal is warranted only when . . . the defendant demonstrates that the [prosecutor's] improper statement affected his or her substantial rights"). An error affects substantial rights if there is "a reasonable probability that but for the error claimed, the result of the proceeding would have been different." *Hill*, 749 F.3d at 1263 (quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quotation marks omitted). We are confident the jury got it right despite possible error.

The government's evidence of guilt was overwhelming. Wagner testified to Dishmon's actions in the bank. Her version of the events was supported by the bank surveillance video as well as other witnesses. Patsy Wall, a customer at the bank at the time of the attempted robbery, heard Wagner tell Dishmon that "she didn't have any money there, that it was in another place" and Dishmon respond, "No, it's not." (R. Vol. 2 at 159.) Based on his tone and her prior experience as a bank teller, Wall assumed the bank was being robbed. Fonseca, who was helping Wall at the time, heard Wagner tell Dishmon that she did not have any money in the drawer. Webb saw Dishmon place something on the teller counter and heard Wagner tell him she could not read it. She also heard Wagner inform Dishmon several times that "her money was not there, it was in the back" and saw Wagner show Dishmon her empty drawer. (*Id.* at 183.) Webb confirmed

- 8 -

Wagner's eye contact and nod, which triggered Webb to activate the alarm.

The government also presented evidence that once outside the bank Dishmon ran to his vehicle, fled from pursuing officers at speeds over 100 mph, hid from law enforcement after the crash, and lied about his identity. These actions are strong evidence of guilt. *See United States v. Morales*, 758 F.3d 1232, 1236 (10th Cit. 2014) ("It is well recognized that a defendant's intentional flight from police officers may be used as circumstantial evidence of guilt.") (quotation marks omitted).

Dishmon sees it otherwise. He says the government's evidence was not overwhelming because it largely depended on Wagner's ability to accurately perceive the events. And her ability to do so was called into doubt by his pharmacologist, Dr. Craig Stevens. Stevens testified each of the three medications Wagner took to treat her fibromyalgia had "cognitive adverse effects." (R. Vol. 2 at 417.) These effects include anxiety, disorientation, confusion, hallucinations, and blurred vision. Stevens told the jury that these effects appear to a greater extent in individuals, like Wagner, who take the medications "in combination." (*Id.* at 433.) He opined that a person taking all three drugs "more than likely" suffered from these adverse effects and "believe[d] Ms. Wagner was affected by these drugs that may have affected her perception." (*Id.* at 432-34.)

However, Stevens could not <u>in fact</u> say Wagner was suffering from any side effects, or for that matter, which ones. That is because he never directly observed her in a medicated state. He also admitted that nothing in her medical records indicated she suffered any side effects from the medications. In contrast, the judge and the jury witnessed Wagner on her medications. She testified to having taken the same

medications (as taken the day of the robbery) before testifying. The judge found Wagner to be "unflappable and utterly credible." (R. Vol. 1 at 326.) There is no indication the jury would have found otherwise. Moreover, while none of the other witnesses heard Dishmon threaten Wagner, they did collaborate Wagner's version of events.

Dishmon also argues the jury's question during deliberations about the intimidation element of attempted robbery (discussed below) "suggests at least some of the jurors were struggling with the case even in the face of the prosecutor's improper closing arguments." (Appellant's Op. Br. at 20.) Thus, "[t]his Court can have no confidence that the jury could have convicted had that improper argument not occurred." (*Id.*) We disagree.

In order to find Dishmon guilty of attempted robbery, the jury was told it must find beyond a reasonable doubt that he "attempted to take the money by means of force and violence or by means of intimidation." (R. Vol. 1 at 253.) Nevertheless, during the second day of deliberations, the jury requested "clarification on intimidation and the boundaries defined as intimidation. Can attempted robbery occur without intimidation?" (R. Vol. 2 at 606.) The judge referred the jury to the instructions. We fail to see how the jury's question undermines confidence in the jury's verdict. The jury's question was a legal one; it had nothing to do with the evidence or what the prosecutor improperly referred to as "facts."

We also take comfort in the jury instructions. Prior to closing arguments, the judge twice told the jury the evidence consisted of the testimony of witnesses, the exhibits, and any stipulations by the parties. *See supra* n.5. He also informed the jury,

"It will be your duty to find from the evidence what the facts are."  (R. Vol. 1 at 233.)

We presume the jury followed these instructions.  *See United States v. Rogers*, 556 F.3d 1130, 1141 (10th Cir. 2009).  These instructions "immunize[d]" any improper argument from affecting Dishmon's substantial rights.  *United States v. Vann*, 776 F.3d 746, 760 (10th Cir. 2015).

**AFFIRMED**.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge