**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**February 5, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

RAUL HERNANDEZ-MORENO, a/k/a
Raul Moreno,

    Defendant - Appellant.

No. 23-5010
(D.C. No. 4:21-CR-00386-BRW-1)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BACHARACH**, **BRISCOE**, and **MORITZ**, Circuit Judges.
_____

Defendant Raul Hernandez-Moreno (Moreno[1]) was convicted by a jury of two

counts of carjacking, in violation of 18 U.S.C. §§ 2119(1) and 2, two counts of

knowingly carrying, using, and brandishing a firearm in relation to a crime of

violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2, and one count of being

an undocumented alien in possession of a handgun and ammunition, in violation of

18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2).  Moreno was sentenced to a total term of

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] Because the parties' appellate briefs refer to defendant as "Moreno," we do
the same in this opinion.

imprisonment of 225 months, to be followed by a five-year term of supervised release.

Moreno now appeals his convictions, arguing that the district court plainly erred in allowing the investigating detective to testify at trial regarding his impressions of the truthfulness of post-arrest statements made by one of Moreno's co-defendants.  Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the judgment of the district court.

I

Moreno, a citizen of Mexico, illegally entered the United States in 2016 to obtain work and financially support his family in Mexico.  Most recently, in early 2020, Moreno was working in Tulsa, Oklahoma, laying sheetrock.

In May 2020, Moreno met a woman named Nicole Rumualdo Hughes.  The two became romantically involved and, in June 2020, began living together in an apartment at the Echo Trails Apartment complex in east Tulsa.

Hughes was a longtime user of methamphetamine.  By her own admission, Hughes had been using methamphetamine "every day all day" since the age of seventeen.  ROA, Vol. II at 165.  Moreno also used methamphetamine.  Once they began living together, Hughes and Moreno began using methamphetamine together every day, and as many times per day as they could afford.

At some point after Moreno began living with Hughes, he stopped working.  Thereafter, Moreno and Hughes initially supported their methamphetamine habits by stealing.  In late September or early October 2020, Hughes's criminal behavior

escalated after she met a man named Carlos Arroliga. At that time, Hughes and Arroliga began committing armed robberies together. That behavior led to the two offenses at issue in this case.

On the morning of October 26, 2020, Moreno and Hughes ran out of methamphetamine and began talking about robbing people at gunpoint in order to obtain money to purchase more methamphetamine. They decided they would, together with Arroliga, drive through apartment complex parking lots and look for random people to rob.

At approximately 6 a.m. that morning, Arroliga, Hughes, and Moreno began driving around in Arroliga's blue Ford sport utility vehicle (SUV), looking for people to rob. Arroliga drove the SUV, Hughes was in the front passenger seat, and Moreno was in the backseat. The initial plan, according to Hughes, was to take someone's wallet at gunpoint.

Between approximately 7 a.m. and 7:30 a.m., the trio were driving through an apartment complex parking lot when Hughes observed a man standing next to a Mazda sedan. That man, William Paniagua, lived in the apartment complex and had left his apartment to walk to his car to retrieve a sweater and jacket. Hughes directed Arroliga to park the SUV next to Paniagua's car. Arroliga did so and then gave Hughes a handgun. Arroliga told Hughes and Moreno that the handgun was loaded and had no safety. Both Hughes and Moreno got out of the SUV. Hughes approached Paniagua from the front, holding the handgun and pointing it at Paniagua's stomach area. Moreno approached Paniagua from behind. Hughes asked

3

Paniagua for his wallet.  Paniagua responded that he did not have it with him.  Hughes then asked Paniagua for his cell phone, but Paniagua again told her he did not have it with him.  Hughes grabbed the keys to Paniagua's Mazda sedan out of his hand and told him to go back to his apartment.  Hughes got into the driver's seat of Paniagua's car and drove away.  The evidence is conflicting regarding what Moreno did.  According to Hughes, Moreno got into the front passenger seat of Paniagua's car and drove away with Hughes.  Paniagua recalls, however, that Moreno got back into the SUV and drove away with Arroliga.

Hughes drove the stolen car to a parking lot near the apartment complex where she and Moreno lived.  There, Hughes and Moreno removed the radio from the stolen car, and Moreno removed the speakers from the doors of the stolen car.  Their plan was to sell the radio and speakers to obtain money to purchase methamphetamine.

After stealing and ransacking Paniagua's car, Hughes, Moreno, and Arroliga decided to look for another person to rob.  As they drove through the Bristol Park Apartment complex in east Tulsa, Moreno observed an apartment maintenance worker, later identified as Misael Espinoza, standing on the driver's side of a Chevrolet Silverado work truck that was backed into a parking spot.  Moreno told Arroliga to park next to the work truck and Espinoza.  After Arroliga parked the SUV, Arroliga gave the handgun, which was still loaded, to Moreno.  Moreno then got out of the SUV and approached Espinoza from behind.  Moreno put the gun to Espinoza's neck or back (the record is conflicting on this point).  Espinoza turned around and faced Moreno.  Moreno demanded $20 from Espinoza, as well as the keys

4

to Espinoza's truck. Espinoza handed his keys to Moreno. Moreno then pushed Espinoza towards the back of the truck, got into the truck, and drove away. Arroliga and Hughes followed Moreno in the SUV.

Moreno drove Espinoza's truck to the same location where they took Paniagua's car. There, they removed tools and HVAC parts from Espinoza's truck and placed them in the SUV. After doing so, Hughes and Moreno used Paniagua's car to drive around and steal items out of mailboxes.

The Tulsa Police Department was alerted to and investigated both robberies. Based upon surveillance video footage, the police determined that a blue SUV was likely involved in both robberies. A Tulsa patrol officer located the SUV and performed a traffic stop on it. Arroliga, who was driving the SUV alone at the time of the stop, was placed under arrest based on some outstanding arrest warrants. Arroliga was subsequently interviewed, admitted to his involvement in the two robberies earlier that day, and identified Hughes and Moreno as his accomplices. A search of Arroliga's SUV produced a handgun that Arroliga identified as having been used in the robberies, as well as the tools and HVAC parts that were stolen from Espinoza's truck.

The police located Paniagua's car parked at the Echo Trails Apartment complex where Hughes and Moreno lived. After surveilling the car for approximately an hour and a half, the police observed Moreno and Hughes leave an apartment unit, get into the car, and leave the apartment complex. The police then initiated a stop of the car. Hughes was driving the car and Moreno was in the front

5

passenger seat.  Police observed that the car "was pretty well torn to pieces on the inside." *Id*. at 233.

Moreno agreed to be interviewed by the police.  He initially denied any involvement in the carjackings, but ultimately admitted to being involved in them. Moreno stated that he and Hughes used a BB gun and not a real firearm to carry out the carjackings.  Moreno eventually provided the police with the location of Espinoza's truck.  The police found the truck at that location.  Inside the truck was a black BB gun that did not belong to Espinoza.

Hughes also agreed to be interviewed by the police, and she ultimately pleaded guilty and cooperated with the prosecution.  During a Rule 11 meeting involving Hughes, her attorney, and prosecutors, Hughes stated that Moreno always carried a BB gun with him, but did not give a specific reason for why he did so.  But, notably, Hughes stated that she did not recall seeing the BB gun on the day of the carjackings. According to Hughes, the firearm that she and Moreno both used during the two carjackings was a loaded handgun, green and black in color, that Arroliga provided to them.

## II

On September 7, 2021, a federal grand jury returned a six-count indictment against Moreno, Hughes, and Arroliga.  Counts One and Three charged the three defendants with carjacking, in violation of 18 U.S.C. §§ 2119(1) and 2.  Counts Two and Four charged the three defendants with knowingly carrying, using, and brandishing a firearm in relation to a crime of violence, in violation of 18 U.S.C.

6

§§ 924(c)(1)(A)(ii) and 2.  Counts One and Two pertained to the carjacking of the Mazda sedan; Counts Three and Four pertained to the carjacking of the Chevrolet Silverado work truck.  Count Five charged Moreno with being an undocumented alien in possession of a handgun and ammunition, in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2).  Count Six charged Hughes with being a felon in possession of a handgun and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

The case against Moreno proceeded to a jury trial on January 11, 2022.  At the conclusion of all the evidence, the jury found Moreno guilty of all five counts charged against him.  With respect to the two carjacking counts (Counts 2 and 4), the jury also found that the firearm used in the carjackings was brandished.

The district court sentenced Moreno to a total term of imprisonment of 225 months, which was comprised of 57 months as to each of Counts One, Three, and Five, to run concurrently with each other, and 84 months as to each of Counts Two and Four, with those terms to run consecutively to each other and consecutively to the sentences imposed on Counts One, Three, and Five.  The district court also imposed a five-year term of supervised release.

Final judgment was entered in the case on February 3, 2023.  Moreno filed a timely notice of appeal.

III

Moreno asserts a single issue on appeal: that "[t]he district court plainly erred in allowing" Bryant Ward, the investigating detective with the Tulsa Police Department, "to testify to the effect that he believed . . . Hughes'[s] account and disbelieved . . . Moreno's account" of which gun was used during the carjackings, i.e., the actual firearm that Arroliga had in his SUV or the BB gun that was later found in the truck stolen from Espinoza.  Aplt. Br. at i.  Moreno argues that "whether [he] and his codefendants used a BB gun or a real gun was the central factual dispute in the case, and the jury's resolution of that question was critical to whether it convicted on each of the five charged counts."  *Id*. at 11–12.

Given his failure to object at trial, "[p]lain error review requires" Moreno "'to establish that (1) the district court committed error; (2) the error was plain—that is, it was obvious under current well-settled law; (3) the error affected the defendant's substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings.'"  *United States v. Walker*, 85 F.4th 973, 983 (10th Cir. 2023) (quoting *United States v. Booker*, 63 F.4th 1254, 1258 (10th Cir. 2023)).

*1)  Did the district court commit error?*

Moreno argues that the district court violated Federal Rule of Evidence 608(a) by allowing Ward to testify on direct examination regarding his impressions of Hughes's testimony and post-arrest statements.  Rule 608(a) provides:

> A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character. But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked.

Fed. R. Evid. 608(a). In *United States v. Jones*, 74 F.4th 1065 (10th Cir. 2023), we noted, applying Rule 608(a), that "witnesses may only speak to another witness's <u>character</u> for truthfulness or untruthfulness," and "cannot speak to whether another witness was truthful or not on a <u>specific occasion</u>." *Id*. at 1069 (internal quotation marks omitted).

In order to determine whether there was a violation of Rule 608(a) in this case, it is necessary to review in detail the key questions that the prosecutor asked Ward during trial. On direct examination, Ward was asked by the prosecutor about his interviews with Moreno and Hughes. After Ward testified that Moreno "admitted to having been involved in the" two carjackings, the prosecutor asked Ward if Moreno "tr[ied] to minimize the dangerousness of the situation?" ROA, Vol. II at 237. Ward testified, "He did." *Id*. The prosecutor then asked Ward, "How so?" *Id*. Ward responded: "He commented—when I started questioning him about the gun that he used, he commented about the fact that the gun was a BB gun and not a real gun." *Id*. Later during Ward's direct examination, the prosecution asked Ward, "Did you think [Moreno] was very forthcoming in his interview?" *Id*. at 239. Ward responded, "No, ma'am." *Id*.

When Ward testified that he also interviewed Hughes, the prosecutor asked: "What was your impression of what Ms. Hughes had to say?" *Id*. Ward responded:

9

"Partial truths, which isn't uncommon.  You know I think everybody when they're talking to the police they obviously want to try to make themselves look as good as they possibly can, especially in something like[] this so she kind of tried to minimize her involvement and—but overall I think she gave me a general—pretty solid general idea of what actually occurred." *Id*. at 239–40.  Moreno's counsel did not object to this testimony from Ward.

Later on in his direct examination, Ward testified about the handgun that was found in Arroliga's SUV and about the BB gun that was found in Espinoza's truck. Ward proceeded to testify that he attended a "Rule 11 meeting" with Hughes, her attorney, and prosecutors and that, during the meeting, there was a discussion about a BB gun. *Id*. at 246.  According to Ward, Hughes stated during the meeting that Moreno always carried a BB gun with him, but she did not give a specific reason why Moreno did so.  Ward testified that Hughes stated during the same meeting, however, that she did not recall seeing the BB gun on the day of the carjackings.

The prosecutor then asked Ward: "[D]uring the Rule 11 with Ms. Hughes, compared to when you initially talked to her on October 26, 2020, could you tell whether or not she was forthcoming?" *Id*. at 248.  Moreno's counsel objected to the question, arguing: "He's not allowed to testify whether or not his opinion of somebody is truthful or untruthful." *Id*.  The prosecutor responded: "Your Honor, he's already testified about whether or not she was forthcoming in the first interview." *Id*.  The district court stated: "I'm going to overrule the objection, save exception." *Id*.  The prosecutor then repeated his question to Ward: "What was your

10

opinion about her—about how—about whether or not she was forthcoming in the second interview?" *Id*. Ward responded: "She seemed much more forthcoming in the Rule 11 interview than she was when I initially interviewed her." *Id*.

On cross-examination, Moreno's counsel followed up on this line of questioning and the following colloquy occurred between Moreno's counsel and Ward:

> Q. Detective, would you agree with me that Ms. Hughes was less than forthcoming in her testimony today in front of this jury?
> A. She did not recall specifically what she stated, yes, sir.
> Q. Are you more inclined to believe somebody when they tell you something that supports your theory of the case?
> A. I would not say that I am—I individually am more inclined, no sir.
> Q. What do you do to keep yourself from engaging in what psychologists would say [is] confirmation bias?
> A. I just try to identify the facts of the case.
> Q. Okay. Well, isn't it a fact of the case that when you interviewed Mr. Moreno that he told you that he had a toy gun?
> A. That is correct, sir.
> Q. And he told you that gun was black?
> A. That is correct.
> Q. He told you where the truck was at?
> A. That's correct.
> Q. You sent an officer out there?
> A. Yes, sir.
> Q. There was the truck there?
> A. Yes, sir.
> Q. They gave the truck to Mr. Espinoza or Espinoza?
> A. Yes, sir.
> Q. But they gave it back to the owner?
> A. Yes, sir.
> Q. He called you or the police and he said "there's a toy gun"?
> A. That's correct.
> Q. You went and picked the toy gun up or one of you guys did?
> A. That's correct. Officer Anderson picked up the BB gun.
> Q. And it was black?
> A. That's correct.

11

Q. And you sat right there when Mr. Espinoza testified and I showed him a picture of the gun and he couldn't say whether it was the gun or not?

[PROSECUTOR]: Objection; that's a misstatement of facts, Your Honor.

THE COURT:  Overruled.

A. I believe his exact statement was that the gun used was similar to that but that the gun in the photo was not the gun that was used.

Q. Do you remember me asking him [if] it either is the gun, it isn't the gun, or I don't know if it's the gun, and he wouldn't give us an answer?

A. I believe his first response was that was not the gun used in the robbery, yes, sir.

Q. And you don't have a single witness in this robbery that [sic] identifies a green gun, do you?

A. No, sir.

Q. And the gun that is your theory that you're claiming belonged to Mr.—or that Mr. Moreno possessed was found in the vehicle of Carlos Arroliga?

A. Arroliga, yes, sir.

Q. Yes.  So it was found in somebody else's possession?

A. That's correct.

***

Q. After—and it was found in his possession like a couple of hours after the robbery; right?

A. That's correct.

Q. And the only evidence that you have that's been admitted here, including all the stuff that's in the government's exhibits that puts a green gun in Mr. Moreno's hand, is the testimony of Ms. Hughes?

A. That's correct.

Q. And would you agree with me that Ms. Hughes is not a reliable and trustworthy person?

A. I would think in this instance she's trying to do the right thing.  I would say she's giving truthful testimony.

Q. Is that because her testimony supports your version of the events?

A. I would say that it corroborates the facts that we've already been given.

Q. But it disputes all of the facts that I just laid out, doesn't it?

A. As far as the black gun, that is correct.  Her statements dispute what you've stated.

Q. She's the only one; isn't that true?

A. No.  She was—she was not.  The other co-defendant specified that a gun matching this description was used.

Q. So the other co-defendant blamed somebody else other than himself too?

A. You are correct.

Q. Now, does a report exist in which that green gun was tested by the Tulsa Police lab testing it for fingerprints?

A. I believe it does, yes, sir.

Q. Okay. What does it say?

A. I don't recall specifically.

Q. Isn't that an important fact for you to know?

A. Yes, sir.

Q. Wouldn't that be an important fact for this jury to know?

A. Yes, sir.

Q. Does a report exist where that green gun was tested for Mr. Moreno's DNA?

A. Not—it was not tested directly in comparison with his DNA, no, sir.

Q. It was not tested because you did not request that it be tested?

A. That's correct.

Q. And you have the ability to make that request?

A. Yes, sir.

Q. And you chose not to do so?

A. That's correct.

Q. Does the report exist where the bullets that you recovered were tested for Mr. Moreno's fingerprints?

A. They may have been examined but our lab rarely recovers fingerprints from guns. Or, I'm sorry, from ammunition.

Q. Do you realize that multiple homicide detectives have testified over the years that they do recover?

A. It does happen but not as frequently as we would like to think.

Q. Okay. Well let's come back to the question that I asked. Does a report exist where those bullets were tested for fingerprints?

A. I don't recall if I requested that the ammunition be tested.

Q. Does a report—tested for fingerprints?

A. Correct.

Q. Does a report exist where the ammunition was tested for DNA?

A. I did not request DNA on ammunition.

Q. And you agreed you can get DNA off ammunition?

A. You can, yes, sir.

Q. In fact especially when you load the magazine, it has a tendency to leave DNA on it, doesn't it?

A. That's correct.

Q. And the slide and the magazine itself?

A. Yes, sir.

Q. So all we're left with as evidence introduced here is Ms. Hughes'[s] statements?

A. That's correct.

Q. You would agree with me, would you not, that if what Mr. Moreno said is true about using a toy gun, the BB gun, that he couldn't have had the intent to cause death or serious bodily injury for somebody with a BB gun?

A. I would not agree with that statement, no, sir.

Q. Is it the shoot your eye out thing? Is that it?

A. It is personal experience, yes, sir.

Q. So that's that—that would be the fall-back position I guess is that if he didn't use the green gun, he was planning on shooting somebody's eye out with the BB gun?

A. I can tell you that a BB gun is capable of causing at the very least serious bodily injury and potentially death if shot in the right place.

Q. But we're not talking about capability, we're talking about intent, aren't we?

A. I would say if someone shot somebody with a BB gun, then the intent would be to cause serious bodily injury.

Q. You ever have any BB gun wars as a kid, you and your brothers?

A. That would be one of the reasons that I can tell you that it's capable of causing bodily injury, yes, sir.

Q. We're talking about serious bodily injury or death.

A. And again from personal experience I can tell you that, yes, serious bodily injury is possible.

*Id*. at 249–55.

On redirect, the prosecutor and Ward engaged in the following colloquy regarding the firearm that Hughes testified was used in the two carjackings:

Q. Detective Ward, Mr. Adams just said that Ms. Hughes was the only person that [sic] identified the green gun. Did you hear him say that?

A. Yes.

Q. And you—I believe you agreed; is that right?

A. As far as identifying the gun that was used in the robbery, he's referring to Mr. Espinoza stating that a black gun was used. I believe yesterday's testimony there was a description of the gun possibly being a brown color.

Q. Can you pull back out—can you pull the gun back out? Have you had the ability—hold it up please. Have you had the ability to look at that gun down the barrel, just looking at it straight on?

14

A. Yes, I have.

Q. Can you see any green when you're looking at it straight on?

A. Not—I mean just down here along the frame but it's a very minimal amount.

[PROSECUTOR]: Your Honor, can the witness—may the witness stand up for a second?

THE COURT: Yeah.

Q. Can you stand up, please. Just—just where you are. If the—if the defendant is holding the gun and pointing it at someone like Misael Espinoza's chest—did you see him testify how he was holding it toward his chest or stomach area?

A. Yes, I did.

Q. Can you kind of hold it to where it's down but—

A. It's kind of hard to—

Q. Yes, I'm sorry.

A. I believe he—as he described I believe he was saying that the gun was kind of more out away from his body, but essentially he's saying the gun was held in this position.

Q. Is it difficult to see the dark olive green that's on the grip of that gun?

A. It would be if somebody's hand was on the gun.

Q. So basically what color does this gun look like?

A. Again in this light it's black so the gun would probably appear black.

Q. You can have a seat. So the fact that Ms. Hughes calls it a green gun doesn't detract from the fact that the other witnesses, other victims, called that gun black?

A. That's correct.

Q. Because it could be identified as black as well?

A. Yes, ma'am.

Q. And Mr. Espinoza, you heard him say that the BB gun that's been referenced over and over was not the gun used to rob him?

A. That's correct?

Q. To carjack him?

A. That's correct.

*Id*. at 258–60.

At the conclusion of the evidence, the district court instructed the jury that, to convict Moreno of the two carjacking offenses, it had to find, in relevant part, that "at the time Mr. Moreno took the [vehicles], he intended to cause death or serious bodily

15

injury." ROA, Vol. I at 115 (Count 1), 119 (Count 3). The district court explained that "[a] defendant's intent to cause death or serious bodily injury may be conditional," meaning that "in a carjacking case where the driver surrendered or otherwise lost control of his vehicle without . . . Moreno attempting to inflict, or actually inflicting, serious bodily harm, the Prosecution may meet its burden by proving beyond a reasonable doubt that" Moreno "would have at least attempted to seriously harm or kill the driver if that action had been necessary to complete the taking of the car." *Id*. The jury found Moreno guilty of both carjacking counts and, with respect to both counts, specifically found that "the firearm was brandished." *Id*. at 130.

Returning to Moreno's appellate arguments, he argues generally that "Ward's testimony was improper under" Rule 608 "because [Ward] clearly communicated to the jury that he believed Ms. Hughes's story and disbelieved Mr. Moreno's claim that he and his codefendants used a BB gun during the robberies." Aplt. Br. at 13–14. In order to determine whether there was a violation of Rule 608, we address Ward's testimony in the order in which it was given at trial.

We conclude, as an initial matter, that the district court did not violate Rule 608 when it allowed Ward to respond to the prosecutor's question whether Moreno, during his post-arrest interview with Ward, "tr[ied] to minimize the dangerousness of the situation." ROA, Vol. II at 237. Ward responded, "he did," and then, in response to the prosecutor's follow-up question, "How so?" stated that Moreno "commented about the fact that the gun" that was used "was a BB gun and not a real gun." *Id*.

16

Moreno argues in his appeal that "[i]n this context, to say [he] was trying to minimize the situation is equivalent to saying he was being deceptive." Aplt. Br. at 16. Even assuming that Moreno is correct, however, Ward's testimony did not violate Rule 608 because Moreno was not a witness at trial. Rule 608(a), by its plain language, is confined to testimony that either attacks or supports "[a] witness's credibility." Fed. R. Evid. 608(a). Notably, Moreno does not point to any other Rule of Evidence that might have been violated by the admission of this testimony.

We in turn conclude that the district court did not violate Rule 608(a) in allowing Ward to testify on direct examination about whether Hughes was "forthcoming" during her interviews with Ward. In *Jones*, we addressed the question of whether a district court erred in allowing an expert witness to testify that a child sexual abuse victim was "forthcoming" during her forensic interview. 74 F.4th at 1070–71. We noted that "[t]he most common definition of 'forthcoming' concerns an individual's willingness to divulge information." *Id*. at 1071 (citing dictionary definitions). We concluded that "[t]o say that someone is 'forthcoming' therefore means that he or she is willing to speak, not that he or she is being truthful." *Id*. Applying *Jones's* holding to the facts of this case, we conclude that Ward, in discussing whether Hughes was "forthcoming" in her interviews with him, was not

opining on Hughes's truthfulness, but rather on her willingness to speak with him. Thus, this part of Ward's testimony did not violate Rule 608(a).[2]

That leaves only Ward's testimony on direct examination that Hughes, during her initial post-arrest interview with him, told "[p]artial truths, which isn't uncommon," but that "overall . . . she gave [him] . . . a . . . pretty solid general idea of what actually occurred."  ROA, Vol. II at 239–40.  Moreno argues in his appeal, and we agree, that this testimony amounted to Ward's personal assessment of the truthfulness of Hughes's statements to him during his post-arrest interviews of her. And because Hughes, unlike Moreno, was a witness at trial, it was violative of Rule 608(a) for Ward to opine on what amounted to Hughes's credibility on two specific occasions.

2) *Was the district court's error plain?*

We in turn conclude that the district court's error in allowing Ward to testify on direct examination about his perception of Hughes's truthfulness during her interview with him was plain, given the clear language of Rule 608(a).  As noted, Hughes was a key government witness against Moreno, and Ward essentially opined on Hughes's truthfulness when he interviewed her on two occasions after her arrest and before trial.

---

[2] For that same reason, and because Moreno was not a witness at trial, Ward's testimony about whether Moreno was "forthcoming" in his post-arrest interview likewise did not violate Rule 608.

### 3) Did the error affect Moreno's substantial rights?

"To prove the assumed plain error affected his substantial rights," Moreno "must demonstrate a reasonable probability that but for the error claimed, the result of the proceeding would have been different." *United States v. Parsons*, 84 F.4th 930, 940 (10th Cir. 2023) (quoting *United States v. Hill*, 749 F.3d 1250, 1263 (10th Cir. 2014) (internal quotation marks omitted)). "This burden is a heavy one." *United States v. Guinn*, 89 F.4th 838, 848 (10th Cir. 2023).

Moreno argues that "[h]e can make this showing because it is at least reasonably probable that, absent Detective Ward's improper testimony, the jury would have harbored a reasonable doubt that . . . Moreno and his codefendants used . . . Arroliga's gun, and not the BB gun, during the robberies, a fact that was central to all five of the charged counts." Aplt. Br. at 18. Moreno notes that "[a]t trial, the parties vigorously disputed which gun was employed in the robberies," and the evidence established that a "BB gun was found in . . . Espinoza's truck" after Hughes and Moreno stole it. *Id*. Moreno asserts that "Espinoza described the weapon as black, which better matched the BB gun than the brown and green handgun, and . . . Paniagua described the gun as black or dark brown, which vaguely described either weapon." *Id*. at 19. Moreno also notes that "Ward confirmed that . . . Hughes said during her proffer session that . . . Moreno regularly carried a BB gun." *Id*. Moreno argues that in light of this evidence, "the government's claim that . . . Arroliga's gun was used during the robberies depended largely on whether the jury believed . . . Hughes, who was the only witness with firsthand knowledge of the matter." *Id*.

19

Moreno further argues that "the jury had ample reason to doubt her veracity" because "[s]he was a four-time felon, she admitted to falsely blaming . . . Moreno for everything when she was threatened with life in prison, . . . she acknowledged that she hoped for leniency from federal and state authorities in exchange for her testimony," and "[s]he was also essentially caught lying at trial about whether . . . Moreno usually carried a BB gun." *Id*. Lastly, Moreno argues that "[t]he jury had every reason to believe that . . . Ward was uniquely qualified" as a "trained detective" "to discern whether . . . Hughes and . . . Moreno were telling the truth in the interviews," and "[t]he jury was therefore especially likely to accept his opinion on the matter." *Id*. at 20.

The government argues in response that "the evidence of [Moreno's] guilt was strong, independent of Ward's brief and isolated testimony concerning Hughes's statements and trial testimony." Aple. Br. at 34. The government notes in particular that "Espinoza explained" at trial "that a firearm was pointed at him," and "[a]lthough [he] couldn't describe all of the gun's characteristics, the gun he found in the bed of his truck 'wasn't . . . the same gun that [he] had seen before' and was 'a different color than the one [the carjackers] pointed with.'" *Id*. at 35 (quoting ROA, Vol. II at 79). The government further notes that "Hughes described the 9mm semiautomatic firearm she and Moreno used during the carjackings and said that Arroliga provided the gun." *Id*. In addition, the government notes that "Arroliga's account of which gun was used in the carjackings was consistent with Hughes's

account and contrary to Moreno's account." *Id.* (citing ROA, Vol. II at 252 (cross-examination of Ward)).

The government also asserts that "Hughes's testimony about how the carjackings took place was corroborated by the other facts in the case." *Id.* For example, the government notes that the police "arrested Arroliga hours after the carjackings, driving the same blue [SUV] described by the victims and observed on surveillance videos." *Id.* Further, the government notes, "[i]n the [SUV]'s center console, agents found ammunition, the 9mm semi-automatic firearm, and a blue bandana."[3] *Id.* The government argues that "[t]he location of the firearm and bandana are consistent with the items having been used together during the carjackings." *Id.*

The government concedes that "a BB-gun was located and seized in one of the stolen vehicles," i.e., in the back of Espinoza's truck, but it notes that "the jury heard that Moreno and Hughes used the stolen vehicles throughout the afternoon and the next day, until they were arrested." *Id.* at 35–36. The government asserts that "Hughes's testimony concerning how she and Moreno drove the stolen cars is consistent with testimony from . . . Espinoza that when he got his [truck] back there were lots of papers, tools, and a BB-gun, none of which belonged to him." *Id.* at 36. "The discovery of these items in the truck that were not items used or stolen during the carjackings," the government argues, "corroborated Hughes's testimony that she

---

[3] Hughes testified that she wore a blue bandana to cover her face during the carjackings.

and Moreno drove the stolen vehicles after the carjackings and placed various items in the stolen vehicle." *Id*.

Lastly, the government argues that "Moreno's counsel diffused any prejudice by effectively cross-examining Detective Ward about his opinions, including by pointing out the potential that those opinions were based on confirmation bias." *Id*. at 37.

We conclude that the government has the better of the argument here. Moreno's suggestion that the jury may have had doubts about whether he and Hughes used an actual firearm or a BB gun to carry out the carjackings is based upon three pieces of evidence. First, it is undisputed that when the police recovered Espinoza's truck and then returned it to him, the bed of the truck contained what was ultimately determined to be a BB gun.[4] Second, Hughes stated during her post-arrest interview with Ward that Moreno regularly carried a BB gun. Third, Moreno stated during his post-arrest interview with Ward that he and Hughes used a BB gun to carry out the carjackings.

Notwithstanding this evidence, however, no witness testified at trial that a BB gun was used to carry out either of the carjackings. Instead, Hughes testified that during both of the carjackings, she and Moreno used the loaded firearm that belonged

---

[4] The bed of the truck also contained trash that was not there prior to the carjacking, the passenger compartment contained tools that did not belong to Espinoza, and the vehicle sustained damage after the carjacking.

to Arroliga and that Arroliga stored in the center console of his SUV.[5]  ROA, Vol. II at 175, 181.  Hughes testified that Arroliga gave her that firearm immediately prior to the commission of the first carjacking, and that Arroliga gave that same firearm to Moreno immediately prior to the commission of the second carjacking.  Hughes also clearly stated on redirect that Moreno did not have his BB gun during the two carjackings.  In addition, Espinoza was asked about the various items that were found in his truck after it was recovered, and he stated, in relevant part: "there was also a pistol in the back around the trash *but it wasn't that—the same gun that I had seen before.  It was a different color than the one I was pointed with [sic]*."  *Id*. at 79 (emphasis added).  Lastly, Ward testified that Arroliga, like Hughes, stated during his post-arrest interview that Hughes and Moreno used his firearm to carry out the carjackings.

Moreno focuses exclusively on the issue of Hughes's credibility and what impact Ward's testimony may have had on the jury's assessment of Hughes's credibility.  Moreno's counsel cross-examined both Hughes and Ward regarding Hughes's credibility.  During the cross-examination of Hughes, Moreno's counsel asked her, "Ma'am, are you an honest person?"  *Id*. at 195.  Hughes responded, "I try to be."  *Id*. at 196.  Moreno's counsel in turn asked Hughes, "Has the testimony that you've given to this jury been honest?"  *Id*.  Hughes responded, "Yes."  *Id*.

---

[5] Hughes's testimony on this point was consistent with the text of her written plea agreement, in which she and the government stipulated that "[a] firearm was used and brandished."  ECF No. 59 at 17.

23

Moreno's counsel then attempted to impeach Hughes by delving into her criminal history and drug usage, and by suggesting that she was testifying against Moreno in hopes of receiving "a lighter sentence." *Id*. at 199. Near the end of the cross-examination, Moreno's counsel specifically questioned Hughes about the BB gun:

> Q. Do you remember telling [one of the Assistant United States Attorneys] in that same interview that you never saw the BB gun that Mr. Moreno carried after the robberies?
> A. Yes.
> Q. Now, ma'am, do you remember at the beginning of my cross-examination when I was asking you about the BB gun and when you told them that he always carried a BB gun that you just told this jury that he did not always carry?
> A. He didn't carry it.
> Q. So you're saying there was a BB gun that was owned by Mr. Moreno?
> A. No.
> Q. Well then why would you tell [the Assistant United States Attorney] in that interview that you did not remember seeing the BB gun after the robbery?
> A. I don't remember there ever being a BB gun.
> Q. Are you retracting what you said just a minute ago?
> A. I don't remember there was ever a BB gun.

*Id*. at 205.

Later during the trial, Moreno's counsel cross-examined Ward regarding Hughes's post-arrest statements and trial testimony and Ward's personal assessment of those statements and testimony. Moreno's counsel began by asking Ward, "Detective, would you agree with me that Ms. Hughes was less than forthcoming in her testimony today in front of this jury?" *Id*. at 249. Ward responded, "She did not recall specifically what she stated, yes, sir." *Id*. Moreno's counsel in turn asked

24

Ward, "And would you agree with me that Ms. Hughes is not a reliable and trustworthy person?" *Id*. at 251. Although Moreno's counsel apparently expected Ward to agree, Ward instead responded, "I would think in this instance she's trying to do the right thing. I would say she's giving truthful testimony."[6] *Id*. at 252. Moreno's counsel followed that up by asking Ward, "Is that because her testimony supports your version of the events?" *Id*. Ward testified in response, "I would say that it corroborates the facts that we've already been given." *Id*.

In light of the testimony elicited by Moreno's counsel from both Hughes and Ward on cross-examination, it is evident that the jury was not left to rely solely on the improper testimony given by Ward on direct examination. Instead, Ward reiterated on cross-examination his belief that Hughes provided the jury with truthful testimony. And, most importantly, the jury was able to observe Hughes testify in person and make its own determination of her credibility.

Lastly, and relatedly, we note that the district court provided the jury with two instructions that would have helped to mitigate any harm caused by Ward's improper testimony:

> You have heard the testimony of Nicole Rumualdo Hughes. You have also heard that, before this trial, she made a statement that may be different from her testimony here in court. This earlier statement was brought to your attention only to help you decide how believable her testimony in this trial was. You cannot use it as proof of anything else. You can only use it as one way of evaluating her testimony here in court.

---

[6] We note that this would have been a reasonable question for Moreno's counsel to ask Ward irrespective of Ward's earlier testimony on direct examination regarding Hughes's credibility.

25

ROA, Vol. I at 111.

> The Prosecution called as one of its witnesses an alleged accomplice, who was named as a co-defendant in the Indictment. The Prosecution has entered into a plea agreement with the co-defendant. Plea bargaining is lawful and proper, and the rules of this court expressly provide for it.
>
> An alleged accomplice, including one who has entered into a plea agreement with the Prosecution, is not prohibited from testifying. On the contrary, the testimony of an alleged accomplice may, by itself, support a guilty verdict. You should receive this type of testimony with caution and weigh it with great care. You should never convict a defendant upon the unsupported testimony of an alleged accomplice, unless you believe that testimony beyond a reasonable doubt. The fact that an accomplice has entered a guilty plea to the offense charged is not evidence of the guilt of any other person.

*Id*. at 113. These two instructions effectively guided the jury's consideration of Hughes's statements and testimony.

For all of these reasons, we conclude that Moreno has failed to demonstrate a reasonable probability that the result of the trial would have been different had Ward not been allowed to testify regarding his assessment of Hughes's statements and testimony. We therefore conclude that he is not entitled to relief on appeal.

<div align="center">IV</div>

The judgment of the district court is AFFIRMED.

<div style="margin-left: 50%;">
Entered for the Court


Mary Beck Briscoe
Circuit Judge
</div>

<div align="center">26</div>